**Christopher GREEN, Appellant,**

**v.**

**Dwainia ALFORD, Individually and as Next Friend of Aaron Alford, and Ronald Alford, Appellees.**

**No. 14–05–00407–CV.**

Court of Appeals of Texas, Houston (14th Dist.).

July 15, 2008.

Rehearing Overruled Nov. 20, 2008.

William S. Helfand, Kevin D. Jewell, Roger D. Townsend, Norman Ray Giles, Houston, for appellant.

Randall O. Sorrels, Raul Herman Suazo, Nicole Perdue, Bruce E. Ramage, Clyde James Jackson III, Kevin Graham Cain, Dale Jefferson (Intervenor), Houston, for appellees.

En Banc Court consists of Chief Justice HEDGES, Justices YATES, ANDERSON, FOWLER, FROST, SEYMORE GUZMAN, BROWN and BOYCE, and Senior Justice HUDSON.*

## MAJORITY OPINION ON EN BANC REHEARING

EVA M. GUZMAN, Justice.

We grant Ronald and Dwainia Alford's motions for rehearing en banc, withdraw our opinion and judgment of March 27, 2007, and issue the following majority opinion on en banc rehearing and accompanying judgment in its place.

This case arises from a traffic accident in which a fire truck collided with another vehicle, causing Ronald Alford to sustain a broken neck and causing permanent neurological damage to his nine-year-old son, Aaron. The trial court found that Christopher Green, the firefighter driving the truck, acted recklessly and was not entitled to official immunity or limitation of liability. Green asks us to reverse the judgment against him, arguing that there is legally and factually insufficient evidence that he acted recklessly and that his actions were not performed in good faith. In the alternative, he raises a matter of first impression, arguing that damages are statutorily limited to $100,000 because he is insured by a policy purchased by the City of Pasadena, despite the fact that coverage is subject to a $100,000 self-insured retention. We conclude that (a) Green failed to establish he was acting in good faith at the time of the accident, (b) legally and factually sufficient evidence supports the trial court's finding that Green acted recklessly, and (c) the damage cap set forth in section 108.002 of the Civil Practice and Remedies Code does not apply to these facts. We therefore affirm the trial court's judgment.

### I. FACTUAL AND PROCEDURAL BACKGROUND

#### A. Uncontested Facts

At approximately 5:15 p.m. on August 30, 2002, Christopher Green, a volunteer firefighter for the Pasadena Volunteer Fire Department, received notice that an automatic fire alarm had been activated. He arrived at the fire station in fewer than five minutes and waited for additional firefighters to arrive before responding to the alarm. Green and the other firefighters then departed on Engine 81, an eight-person fire truck, which, including the firefighters, weighed 39,500 pounds. In the intersection of Jana Lane and westbound Fairmont Parkway, the fire truck collided with a pickup truck occupied by three members of the Alford family. The collision propelled the pickup truck diagonally across the intersection where it crashed into the utility pole supporting the traffic lights. Dwainia Alford suffered comparatively minor injuries, but Ronald sustained a broken cervical vertebrae. Nine-year-

* Senior Justice J. Harvey Hudson sitting by assignment.

old Aaron was the most severely injured; he remained in a coma for twelve days and suffered severe neurological trauma from his head injuries.

On October 18, 2002, Dwainia Alford, acting in her individual capacity and as Aaron's next friend, sued Green for damages stemming from the accident. Ronald Alford intervened. Following a nonjury trial, the trial court entered judgment against Green for an amount in excess of $1.5 million. The trial court made specific findings of fact and conclusions of law holding that Green engaged in reckless conduct and was not entitled to official immunity because he was not acting in good faith at the time of the accident. The trial court's ruling was based on the contested evidence summarized below.

## B. Fact Witnesses

### 1. Appellees Ronald and Dwainia Alford, Pickup Truck

Ronald Alford testified that immediately before the accident, he was driving in the northernmost lane of westbound Fairmont Parkway with his wife and son. He stated that his radio was off, and the traffic light facing him at Jana was red, but it turned green as he slowed to approach the intersection. According to Alford, he looked to his right and left, saw that the cross-traffic was stopping, and entered the intersection at approximately 30 miles per hour. He stated that he "just caught a flash of [the fire truck] out of . . . the corner of [his] eye" before the fire truck struck his vehicle in the middle of the driver's side. Dwainia Alford testified that traffic to the left of the pickup obscured her vision, but she never heard a siren or horn before the impact.

### 2. Appellant Christopher Green and Richard Lawhorn, Fire Truck

Green testified that he activated the fire truck's emergency lights and siren before he left the fire station, and as he turned north on Jana, he began to periodically sound his horn. Volunteer firefighter Richard Lawhorn, who was riding in the front passenger seat beside Green, similarly testified that the fire truck's lights and siren were on. Green stated that he drove at no more than 30 miles per hour,[1] and as he neared the intersection of the westbound lanes of Fairmont Parkway, the traffic light facing him was red. Green testified that he slowed and looked to his right, saw that traffic in the first two lanes was stationary, and saw no traffic in the third lane. Lawhorn testified that he, Lawhorn, could not see the third lane of Fairmont due to the heavy traffic, which was backed up nearly to the next intersection. Lawhorn leaned forward to put on his jacket[2] while Green entered the intersection at a speed that Lawhorn estimated to be no more than 20 to 25 miles per hour. According to Green, "After I saw that there was two lanes of traffic stopped, didn't see the third and started to proceed through that—that lane those three lanes and had the accident." Green further stated that his speed was no more than 10 miles per hour.

Although Green testified that he drove slowly enough to stop before hitting any

1. The speed limit on Jana Lane was 30 miles per hour.

2. Regarding Lawhorn's actions in putting on a jacket, Green testified as follows:

> Q: And isn't it true that he was putting on his jacket at the very moment when the collision was occurring?

> A: I believe so. I don't really know.

> Q: Now, that jacket, that he was putting on, that didn't block your vision to the east, did it?

> A: If he is up by the window, I guess maybe so. I don't know how he was or how he was doing it.

vehicle he observed entering the intersection, he also stated that he did not know how to calculate braking distances and would defer to the Alfords' expert, Richard Schlueter, on that subject.[3] Green further agreed that other drivers truthfully testified that he could not react quickly enough to avoid the accident at the speed he was traveling, and the fire truck's speed made it "impossible to stop."

Green did not see the Alfords' pickup before the impact. He did not recall if there were trucks in the first two lanes that could have impaired his view of the far lane but testified that he could not rule out that possibility. He also did not know if Lawhorn blocked his view while putting on a jacket. Green agreed, however, that if a firefighter "could not see the third lane of traffic," the correct approach would be "to stop before proceeding through the intersection." According to Lawhorn, Green should have known there was "a substantial certainty" that if a smaller vehicle collided with Engine 81, there was "a high degree of risk of serious injury."

### 3. Bystanders

Nine other drivers or bystanders testified at trial. Most of these fact witnesses testified that the fire truck's emergency lights were on, and none testified that the emergency lights were off. One witness could not recall if she heard a siren, and the remaining eight were evenly divided as to whether the siren was activated. Four witnesses also testified that Green sounded his horn, but several others denied hearing a horn. Invoices for repairs to the fire truck indicate that its air horns were replaced after the accident.

Several of these witnesses also estimated Green's speed just before the accident. Josef Wells stated that he did not see the fire truck brake as it entered the intersec-

tion at 20 to 30 miles per hour. Glenn Daley also testified that he did not see the fire truck slow down or see its brake lights activate, and he estimated the fire truck's speed at 30 miles per hour. Douglas Lowther estimated the fire truck's speed at 25 to 30 miles per hour, and James Vaught placed its speed at no more than 30 miles per hour. According to Victor Lucero, the truck "zoomed right through" the intersection at 40 to 50 miles per hour. Jamie Faulkner did not estimate the fire truck's speed, but testified that it approached "very fast" and did not slow or stop before entering the intersection.

### C. Expert Witnesses

#### 1. Dr. Mark Mayo, Bayshore Eye Associates

Since 1995, Dr. Mark Mayo has treated Green for keratoconus, a progressive eye disease that weakens the cornea and causes it to develop irregular curvatures. Such curvatures can cause blurring and decreased distance vision and affect a person's ability to drive. When Green first became a patient, his keratoconus was between mild and moderate in severity, and his vision was correctable with glasses "to a fairly high level." In 1997, however, Green reported that he had failed a vision test necessary for a driver's license, and Green's lens prescription was changed.

In November 2001, nine months before the accident, Green complained to Mayo of decreased distance vision. Tests showed that Green's vision had worsened, and medical records indicate that Green "did not want contact lenses because of his job as a firefighter." According to Mayo, "any activity in which [Green] was looking into the distance would be affected without correction." Although Green's visual acuity was becoming progressively worse, Mayo

---

**3.** Schlueter's testimony is summarized *infra* at 12–13.

stated that at the time of the accident, Green's "visual acuity with glasses was sufficient to drive an automobile." Within four months of the accident, however, Green's vision was so poor he had difficulty watching television.

### 2. Jerry Gardner, Chief of the City of Pasadena Fire Department

Chief Gardner testified that firefighters must comply with state law and local ordinances, and he would not authorize a violation of state law. Gardner agreed that it would be a violation of state law, city ordinance, and department policy to drive a fire truck though a red light without the sirens activated. Moreover, Gardner agreed that doing so would be reckless. Although there are recordings of radio transmissions from Engine 81, Gardner testified that no siren can be heard on these recordings.

Gardner stated it was his understanding that Green did not come to a complete stop before entering the intersection of Jana Lane and westbound Fairmont Parkway. He further agreed that, according to Green's statement at the scene, "[Green] had slowed down for westbound Fairmont. It appeared that two of the three lanes were yielding. So, [Green] was going to move on forward and continue northbound onto Jana . . . ." According to Gardner, a firefighter who cannot see one lane should stop before proceeding into the intersection; however, Gardner also testified that if a firefighter cannot see one lane, he should "[p]roceed with due regard[,]" which means slowly enough to stop if nec-

essary. As Gardner stated, "I guess creeping with your foot on the brake would be slow enough to stop."

Although Gardner is the chief of the fire department where Green volunteered, Gardner did not know that Green had keratoconus and did not "have any recollection of [Green] wearing glasses." Moreover, Gardner agreed that "[n]o reasonable fire operator [sic] could believe that driving a fire truck in responding to a call without his glasses or corrective lenses as required by his driver's license would be reasonable when other drivers [are] available to drive."

### 3. Richard Schlueter, P.E., Accident Reconstruction Expert

Accident reconstruction expert Richard Schlueter testified that Green was driving at approximately 23 miles per hour at the time of impact, and the Alfords were traveling at approximately 25–30 miles per hour.[4] He further testified that Green could not have slowed to 10 miles per hour as he approached westbound Fairmont Parkway, because the fire truck could not have accelerated from 10 to 23 miles per hour in the short distance between the beginning of the intersection and the location of the impact. According to Schlueter, if a fire truck driver detected a hazard while driving at 10 miles per hour, the fire truck would travel 20 to 21 feet before it could be brought to a stop; at 25 miles per hour, the braking distance increased to 75 feet. At the intersection where the accident occurred, each of the three lanes is 11 feet wide, and the total width of the intersection is only 33 feet.[5] Schlueter also

---

4. According the Schlueter, his calculations were based on police measurements taken at the scene, photographs of the Alfords' truck, inspection of the fire truck and the accident scene, crash test data from a pickup similar to the Alfords' truck, and the parties' stipulation that the fire truck and firefighters had a combined weight of 39,500 pounds. His calculations included a post-impact trajectory analy-

sis, a momentum analysis, a simulation of the collision, a roll trip analysis, a pole interaction calculation, and visual comparison of the damaged vehicles.

5. Gardner agreed that if the fire truck was traveling at 23 miles per hour, then it could not stop within 22 feet.

performed calculations regarding lines of sight and concluded that if Green had stopped anywhere within the area of the two inside turn lanes on Jana, he could have seen the third lane of westbound Fairmont.

#### 4. Robert Neal Stage, Director of Training, EMS Division, National Academy of Professional Drivers

Robert Stage testified that, in his opinion, Green caused the accident because he failed to secure the third lane of traffic before driving the fire truck into that lane. According to Stage, Green should have known that his actions posed a high degree of risk of serious injury.[6] Stage further explained that the "extreme high degree of risk" of serious injury is increased during rush hour and when driving against traffic signals. The weight of the fire truck also increases the risk, and obscured views "dramatically increase[ ] the high degree of risk of injury."

Stage also testified that automatic fire alarms do not convey the nature of the emergency, but they rarely signal a life-threatening situation.[7] Here, Green was responding to an automatic alarm less than half a mile from the fire station; he had to pass through two traffic lights to reach that destination, and it would have taken "[p]robably no more than 15 seconds" to proceed "with due regard [to] the public safety[.]" Stage further testified that even

a firefighter responding to a life-threatening situation is required to secure all lanes of traffic and make sure that traffic had yielded the right of way before proceeding into a lane. Balancing the risks posed by failing to follow this procedure versus the need to respond rapidly, the firefighter must secure the lanes, because failure to do so can result in the firefighting team's failure to arrive at the emergency at all. In addition, firefighters and the public could be injured.[8] According to Stage, the risk of harm "should have been most definitely clear to [Green]" and his actions were reckless, regardless of whether his sirens were activated.

### D. Trial Court Rulings

Shortly before trial, the parties filed cross-motions for summary judgment on the application of official immunity and the statutory damages cap. The trial court granted summary judgment in the Alfords' favor on those issues, and Green responded by filing a motion for reconsideration on the day the nonjury trial began. All parties presented evidence on these issues. At the close of evidence, Green moved for judgment as a matter of law on the basis of official immunity. The trial court denied the motion but stated that it would consider Green's evidence on the issue of official immunity.[9]

---

**6.** Training materials in the Pasadena Fire Department's library addressed actual stopping distance and reaction time. For example, a training videotape from that library cautions firefighters to "[u]se all warning devices and come to a complete stop at blind intersections or intersections where the apparatus has a stop sign or light."

**7.** Chief Gardner agreed that Green would have known that most automatic alarms are false alarms.

**8.** According to Stage, traffic accidents while responding or returning from an emergency

constitute the second leading cause of death among firefighters.

**9.** The trial court's final judgment and its findings of fact and conclusions of law indicate that, although no separate order rescinds the interlocutory order granting partial summary judgment, the final rulings were based on the evidence presented at trial. Similarly, in the portions of their post-judgment motions that address Green's defense of official immunity, the parties discuss evidence presented at trial. We therefore follow the lead of the parties and the trial court and treat Green's defense of official immunity as a matter decided based

As the trier of fact, the trial court resolved the conflicting accounts of the accident. After weighing all the evidence, the trial court found, *inter alia,* that (1) Green was not wearing corrective lenses as required at the time of the accident; (2) he entered the intersection against the traffic light; (3) due to traffic in the southernmost and middle lanes of westbound Fairmont Parkway, Green's view of the northernmost lane was impaired; (4) at the time of impact, the fire truck was traveling at 23 miles per hour; (5) the fire truck entered the intersection at a speed too fast to stop for westbound traffic that might be entering the intersection; (6) at the time of the collision, Green was not using the fire truck's siren or other audible warning signal; (7) Green did not act in good faith, and (8) Green's conduct was reckless.

The trial court awarded damages to the Alfords in an amount exceeding $1.5 million. This appeal timely ensued.

## II. ISSUES PRESENTED

In three issues, Green contends the trial court erred in (1) denying his motion for judgment as a matter of law on the basis of official immunity, (2) rendering judgment based on legally and factually insufficient evidence of recklessness and causation, and (3) rendering judgment for damages exceeding the limit of liability set forth in Section 108.002 of the Civil Practice and Remedies Code.[10]

## III. ANALYSIS

### A. Official Immunity

#### 1. *Purpose*

on evidence presented at trial rather than on summary-judgment evidence.

10. Act of May 9, 1995, 74th Leg., R.S., ch. 139, 1995 Tex. Gen. Laws 982, 983–84, *amended by* Act of June, 2003, 78th Leg., R.S., ch. 204, §§ 11.01, 11.07, 2003 Tex. Gen. Laws

Official immunity under common law is based on the necessity for public servants "to act in the public interest with confidence and without the hesitation that could arise from having their judgment continually questioned by extended litigation." *Ballantyne v. Champion Builders, Inc.,* 144 S.W.3d 417, 424 (Tex.2004). It is an affirmative defense barring state law claims against a governmental employee's performance (1) of discretionary duties, (2) within the scope of the employee's authority, (3) provided that the employee acts in good faith. *Id.* at 422; *Univ. of Houston v. Clark,* 38 S.W.3d 578, 580–81 (Tex.2000); *City of Lancaster v. Chambers,* 883 S.W.2d 650, 653 (Tex.1994). The doctrine rests on the theory that the threat of liability will make public officials unduly timid in carrying out their official duties, and effective government will be promoted if officials are freed of the costs of vexatious and often frivolous litigation. *Westfall v. Erwin,* 484 U.S. 292, 295, 108 S.Ct. 580, 583, 98 L.Ed.2d 619 (1988), *superseded by statute on other grounds,* 28 U.S.C. §§ 2671–2679 (1989 Supp.), *as recognized in United States v. Smith,* 499 U.S. 160, 111 S.Ct. 1180, 113 L.Ed.2d 134 (1991). Thus, immunity from state law claims is intended to insulate essential governmental functions from the harassment of litigation and remove the deterrent to public service posed by the threat of heavy personal liability for errors in judgment. *See Ballantyne,* 144 S.W.3d at 424; *Kassen v. Hatley,* 887 S.W.2d 4, 8 (Tex.1994).

Here, the parties do not dispute that two of the three requirements for official immunity are satisfied. They agree that

847,885, 886, eff. Sept. 1, 2003; Act of May 28, 2003, 78th Leg., R.S., ch. 289, §§ 1, 5, 2003 Tex. Gen. Laws 1258, 1258, 1259, eff. Sept. 1, 2003 (current version at TEX. CIV. PRAC. & REM.CODE ANN. § 108.002 (Vernon 1997)).

Green was performing a discretionary duty within the scope of his authority. The only requirement for official immunity in dispute is the existence of good faith.

### 2. Good Faith

■ To determine whether a public official has acted in good faith, we look to the objective standard adopted in *City of Lancaster v. Chambers.* 883 S.W.2d at 656. We examine the record to determine whether a reasonably prudent official, under the same or similar circumstances, could have believed that his conduct was justified based on the information he possessed when the conduct occurred. *Wadewitz v. Montgomery,* 951 S.W.2d 464, 467 (Tex.1997). In making this determination, "consideration of subjective evidence of the good faith element of official immunity is inappropriate." *Ballantyne,* 144 S.W.3d at 419.

This test is intended to balance competing concerns. On one hand, "the court must consider the rights of bystanders or other innocent parties if [a public official] acts in gross disregard of public safety." *Chambers,* 883 S.W.2d at 656. On the other hand, the test is designed to reduce the deterrent effect that the threat of liability may pose to a public official's willingness to act "with the decisiveness and the judgment required by the public good[,]" as well as the injustice of imposing personal liability on a public official whose duties require him to exercise discretion. *Id.*

■ The tension between these concerns is especially clear in instances of "emergency response" driving. The rapid response required of law enforcement personnel, paramedics, and firefighters is essential for the effective performance of their duties, but the same actions also can pose serious risks to motorists, bystanders, and the responding officials themselves. Consequently, claims arising from an official's high-speed or "emergency" driving are subject to a particularized need/risk analysis. *Telthorster v. Tennell,* 92 S.W.3d 457, 464 (Tex.2002) ("[T]he particularized need/risk factors were crafted in an attempt to tailor a test that would better weigh the risks that high-speed chases and responses pose to the general public.").

### 3. Need/Risk Analysis

■ Where "emergency response" driving is concerned, the urgency of the "need" for the official's conduct is measured by factors such as (a) the seriousness of the emergency to which the official is responding; (b) whether the official's immediate presence is necessary to prevent injury or loss of life; and (c) what alternative courses of action, if any, are available to achieve a comparable result. *Wadewitz,* 951 S.W.2d at 467. "Risk" is measured by countervailing public safety concerns such as (a) the nature and severity of harm the official's actions could cause, including injuries to bystanders and the possibility that an accident would prevent the official from reaching the scene of the emergency; (b) the likelihood that any harm would occur; and (c) whether any risk of harm would be clear to a reasonably prudent official. *Id.* Because the information known to the official may change rapidly, leaving little time for deliberation, high-speed emergency responses "require a continuing assessment of need and risk." *Clark,* 38 S.W.3d at 582–83; *see also Wadewitz,* 951 S.W.2d at 467; *Chambers,* 883 S.W.2d at 656–57. If the public official considers multiple courses of action and selects one that a reasonable official could believe to be justified by the information possessed at the time, the duty of good faith is satisfied as a matter of law. *See Ballantyne,* 144 S.W.3d at 426.

### 4. Sufficiency of the Evidence of Good Faith

In support of his contention that he is entitled to a finding of good faith as a matter of law, Green first argues that courts have repeatedly "[m]aintain[ed] the high burden required to defeat immunity" and have held officials immune as a matter of law in cases similar to this. He then asserts that he conclusively established his good faith. Finally, he argues that the Alfords failed to raise a genuine and material fact issue concerning good faith.

We do not find these arguments persuasive. As discussed below, Green's arguments ignore unfavorable evidence, and the cases on which he relies are readily distinguishable. Finally, Green's arguments are based on erroneous conceptions of the evidence to be considered and the standard by which it is reviewed.

### a. Evidence to be Considered

 Green's arguments begin with the faulty assumption that in analyzing the evidence of good faith, we should consider only conduct that has been found to cause the accident. For example, he contends we should disregard Gardner's adverse expert testimony that *no firefighter could* believe it was reasonable to drive the fire truck without required corrective lenses if other firefighters were available to drive because the "purported failure to wear glasses played no part in the accident." Green cites no evidence or finding of fact to support this assertion and identifies no

authority that would allow us to imply such a finding.[11]

 Further, this argument is contrary to precedent. If evidence refuting good faith pertains to the official's performance of a discretionary duty within the scope of his authority, neither the trial court nor the reviewing court is required to disregard that evidence simply because the official's additional misconduct actually caused the harm alleged. *See Chambers*, 883 S.W.2d at 655–56 (stating that government officials are entitled to official immunity from suit arising from the performance of their discretionary duties in good faith as long as they are acting within the scope of their authority). Instead, courts simply measure good faith against a standard of objective legal reasonableness. *Id.* at 656. An officer seeking to overturn a trial court's finding that he failed to act in good faith must address all evidence in the record material to the good faith determination. *See City of Keller v. Wilson*, 168 S.W.3d 802, 825–26 (Tex.2005); *Harris County v. Smyly*, 130 S.W.3d 330, 334 (Tex.App.-Houston [14th Dist.] 2004, no pet.).[12]

### b. Standard of Review

In his brief, Green initially recites the standard of review correctly, but his arguments rely on the application of other standards to the facts. For example, he states,

11. Green's argument also ignores the fact that official immunity is an affirmative defense; thus, Green bore the burden at trial to prove all of its elements. *See Ballantyne*, 144 S.W.3d at 424; *Kassen*, 887 S.W.2d at 8–9; *Chambers*, 883 S.W.2d at 653. And if a defendant relying on an affirmative defense fails to carry his burden at trial, then the factfinder need only refuse to make the requested finding. *See Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex.1989). Because the factfinder is not required to make a contrary affirmative finding, there is no basis for a

requirement that the factfinder go still further and state reasons for such a contrary affirmative finding. Here, the trial court was neither requested nor required to point out reasons that negated a finding of good faith, and did not do so.

12. *See also Rowland v. Perry*, 41 F.3d 167, 173 (4th Cir.1994) ("Artificial divisions in the sequence of events do not aid a court's evaluation of objective reasonableness."), *cited with approval* in *Telthorster*, 92 S.W.3d at 463.

To create a genuine issue of material fact ... on good faith, the non-movant must do more than show that a reasonably prudent officer could have decided against taking the action in question. The non-movant must show "no reasonable person in the officer's position could have thought that the facts justified the officer's acts."

. . .

In sum, and in light of Texas authority discussed above, the Alfords' evidence falls well short of that required to raise a fact question on good faith.

Although these statements incorporate requirements applicable to a summary-judgment respondent, they apply only if the summary-judgment movant has first produced evidence establishing good faith. If the movant has failed to do so, the burden to produce controverting evidence to raise a genuine issue of material fact does not shift to the respondent.[13]

 Here, the Alfords do not begin with the burden to disprove good faith. As previously noted, official immunity is an affirmative defense; thus, Green bore the burden at trial to prove all of its elements. *See Ballantyne*, 144 S.W.3d at 424; *Kassen*, 887 S.W.2d at 8–9; *Chambers*, 883 S.W.2d at 653. We review the trial court's denial of Green's motion for judgment as a matter of law based on the legal sufficiency of the evidence, crediting evidence favoring the verdict if a reasonable factfinder could, and disregarding contrary evidence unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex.2007); *City of Keller*, 168 S.W.3d at

825–26. To establish good faith as a matter of law after the factfinder has resolved conflicting evidence in favor of the claimants, an official appealing the denial of official immunity must prove that, *based on the facts and reasonable inferences favoring the claimants*, a reasonable officer performing a need/risk assessment using that information could have believed the official's conduct to be justified. *See Smyly*, 130 S.W.3d at 334; *cf. Scott v. Harris*, 550 U.S. 372, 127 S.Ct. 1769, 1774–75, 167 L.Ed.2d 686 (2007) (stating that, when reviewing ruling on official's motion for summary judgment claiming qualified immunity, the court usually adopts the plaintiff's version of the facts).

 In addition, an appellant challenging the sufficiency of the evidence offered in a nonjury trial must challenge specific findings of fact. *Zagorski v. Zagorski*, 116 S.W.3d 309, 319 (Tex.App.-Houston [14th Dist.] 2003, pet. denied). We defer to a trial court's factual findings if they are supported by the evidence. *Perry Homes v. Cull*, 258 S.W.3d 580, 598 (Tex.2008). And as a reviewing court, we are bound by any unchallenged findings of fact unless the contrary is established as a matter of law or the finding is not supported by any evidence. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex.1986). Thus, we will reverse the trial court's denial of Green's motion only if the evidence conclusively proves facts establishing his entitlement to official immunity as a matter of law. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex.2001) (a party attacking the legal sufficiency of an adverse finding on an issue on which he bore the burden of proof

---

**13.** To clarify the procedural posture of the case, we note that Green did not appeal the trial court's adverse summary-judgment ruling. *Cf.* Tex. Civ. Prac. & Rem.Code Ann. § 51.014(a)(5) (Vernon Supp.2007) (permitting appeal from an interlocutory order denying summary judgment based on assertion of immunity by employee of the state or political subdivision of the state). Instead, Green appeals the trial court's denial of his motion for judgment as a matter of law.

must demonstrate that the evidence establishes, as a matter of law, all vital facts in support of the issue). If sufficient evidence was presented at trial such that "reasonable minds could differ" regarding the facts on which the claim of immunity is based, then the trial court did not err in denying a motion for judgment as a matter of law. *See Kassen*, 887 S.W.2d at 9.

### (i) No Conclusive Proof of Good Faith

■ According to Green, some of the trial court's factual findings are supported by legally and factually insufficient evidence, and thus, do not support a finding of recklessness. In particular, he challenges the findings that he failed to wear glasses, activate the siren, and slow "as necessary for safe operation" before entering the intersection. He also contests the finding that he had actual awareness that his conduct posed a high degree of risk of serious injury. He does not contend, however, that disregarding these findings, as we are required to do if they are unsupported, undermines the trial court's finding that Green failed to act in good faith. And even if we completely disregard the challenged findings, the trial court's judgment concerning Green's lack of good faith is supported by the unchallenged findings and the evidence.

Here, the trial court made the following findings of fact relevant to Green's information concerning the "need" portion of the need/risk analysis, including the seriousness of the emergency, the need for his immediate presence to prevent injury or loss of life, and the alternative courses of action available to achieve a comparable result:

- Green was responding to an automatic fire alarm, and the overwhelming majority of automatic fire alarms are false alarms or do not require the immediate presence of a firefighter; [14]
- Slowing or stopping at the intersection would have reduced his response time by 15–30 seconds; [15] and
- Other firefighters were available to drive.

These unchallenged findings are supported by the record.

The trial court also made the following findings of fact relevant to a reasonable firefighter's assessment of risk in light of the information available to Green at the time of the collision:

- Green has suffered from keratoconus, a progressive eye disease, since at least 1995;
- In about 1997, Green reported to his eye specialist that he failed a vision

14. These particular facts are undisputed, and the trial court heard conflicting testimony concerning the weight that a reasonable firefighter would assign to these facts in performing a need/risk analysis. Chief Gardner testified that he expects Green to know that the great majority of automatic alarms are false alarms, and in his expert opinion, this knowledge should be a factor in a driver's decision concerning whether to stop when the driver's view of cross-traffic is blocked. On the other hand, Gardner also testified that he treats every alarm as a life-threatening emergency, and Stage testified that the same procedure for securing a lane of traffic applies regardless of whether the firefighter is responding to an automatic alarm or an event known to be

life-threatening. On the facts presented, we reach the same result regardless of whether the alarm is treated as a probable false alarm or the signal of a life-threatening emergency. Our recitation of the facts found by the trial court is not intended to suggest that any specific finding was essential to the trial court's judgment, and we do not suggest that first-responders should or should not treat an automatic alarm as a life-threatening emergency.

15. It is undisputed that the intersections of Fairmont and Jana contained the only traffic lights between the fire station and the site of the alarm.

test conducted by the Department of Public Safety;

- Approximately ten months before the collision, Green reported to his eye specialist that he experienced decreased distance vision and blurring, and he refused a special contact lens prescription due to his job as a firefighter; [16]

- On December 9, 2002, Green reported to his eye specialist that there were changes in his visual acuity; he had blurring of his vision, and difficulty watching television;

- Green never reported any problems with his vision to the Pasadena Volunteer Fire Department;

- A restriction on Green's driver's license requires him to wear corrective lenses;

- At the time of the accident, Green was not wearing corrective lenses when driving the fire truck; [17]

- Other fire fighters were available to drive the truck;

- When Green entered the intersection of Fairmont and Jana, it was evening rush hour on the Friday beginning Labor Day weekend;

- Green had actual knowledge that traffic would be heavy at this intersection;

- The speed limit on Fairmont Parkway was 45 miles per hour;

- When Green entered the intersection, the traffic light facing him was red;

- The traffic light facing westbound Fairmont was green;

- The fire truck weighed 39,500 pounds;

- Trucks in the southernmost and middle lanes of westbound Fairmont Parkway impaired Green's view of the northernmost lane of traffic;

- Prior to the collision, Green did not see the northernmost lane of westbound Fairmont Parkway;

- Driving into this lane without determining whether the vehicles in that lane had yielded to the fire truck posed a high degree of risk of serious injury;

- Green was traveling too fast to stop for any traffic in the northernmost lane of westbound Fairmont Parkway;

- He drove the fire truck into the northernmost lane of westbound Fairmont Parkway at 23 miles per hour;

- Green would have been delayed by 15–30 seconds by stopping or slowing as necessary to ascertain that all traffic had yielded;

- Green was aware of the high degree of risk of serious injury posed by entering the intersection against a red light without first ascertaining that all lanes of cross-traffic had yielded to the presence of the fire truck;

- He did not assess and reassess the risk posed by his conduct and the need for his presence at the scene of the alarm;

- When Green approached the intersection of Jana Lane and westbound Fairmont Parkway, he did not identify and consider the viability of alternative courses of action to achieve a comparable result.

These findings are supported by the testimony summarized in Section I of this opinion.

---

**16.** Green therefore was given a prescription for glasses.

**17.** Operating a motor vehicle without corrective lenses in violation of a driver's license restriction is a misdemeanor criminal offense. *See* TEX. TRANSP. CODE ANN. § 521.221(c) (Vernon Supp.2007).

The trial court also heard expert evidence of the objective standard of reasonableness applicable to these facts. Jerry Gardner, Chief of the City of Pasadena Fire Department, categorically agreed that if other drivers were available, no reasonable fire truck operator could believe it would be reasonable to respond to an alarm by driving a fire truck without wearing corrective lenses required by a restriction on the firefighter's driver's license. This testimony was uncontroverted. And although Gardner ultimately opined that Green acted in good faith, he admitted that he reached that conclusion by assuming the truth of disputed facts—including the assumption that, if required to do so, Green was wearing corrective lenses at the time of the accident—and by failing to consider other uncontroverted facts, such as the higher speed limit on Fairmont relative to Jana. *Cf. City of Keller,* 168 S.W.3d at 813 (reviewing court "cannot consider only an expert's bare opinion, but must also consider contrary evidence").

Considering, under the appropriate standard of review, the evidence of Green's conduct and the circumstances concerning risk and need as the evidence indicates he perceived them, and applying the objective standard of reasonableness, we conclude that Green failed to conclusively establish his good faith. *Cf. Telthorster,* 92 S.W.3d at 463 ("[O]fficial immunity is designed to protect public officials from being forced to defend their decisions that were *reasonable when made,* but upon which hindsight has cast a negative light." (emphasis added)). To the contrary, the evidence is sufficient to support the conclusion that no reasonable fire truck operator could have believed that the need justified the risks Green chose to take.

### c. Green's Legal Authorities

In support of his argument that the evidence is legally insufficient to support the finding that he did not act in good faith, Green analogizes this case to three other cases. As discussed below, however, these authorities are readily distinguishable.

In *City of San Angelo Fire Department v. Hudson,* the Third Court of Appeals reversed and rendered judgment recognizing a firefighter's claim of official immunity. 179 S.W.3d 695, 706–07 (Tex.App.-Austin 2005, no pet.). Unlike the case before us, the firefighter in *Hudson* offered uncontroverted summary-judgment evidence that a reasonable firefighter could have believed the conduct at issue was justified under the circumstances. *Id.* at 704–06. Here, however, even the "conduct at issue" is a matter of dispute. *See Chambers,* 883 S.W.2d at 656–57 (questions of material fact concerning good faith preclude summary judgment). Green contends that he wore his glasses, used the fire truck's horn and siren, checked all three lanes on westbound Fairmont, and proceeded at no more than 10 miles per hour. But there is conflicting evidence that Green did not wear his glasses, did not use the fire truck's horn or siren, did not see the northernmost lane of westbound Fairmont, and entered that lane blindly traveling at 23 miles per hour. The trial court found the latter evidence more credible, and Green presented no evidence that a reasonable firefighter could have believed such conduct was justified.

To avoid the need to address this evidence, Green appears to suggest that, because the factfinder considers the official's perception of circumstances when analyzing good faith, the official's testimony regarding those perceptions must be accepted as true, and contrary evidence disregarded. This suggestion is not only contrary to the standard of review on appeal, but it disregards the factfinder's

role in resolving conflicts in the evidence based on the credibility of the witnesses. *See McGalliard*, 722 S.W.2d at 697.

*Johnson v. Campbell*, another summary judgment case, is also distinguishable. In *Johnson*, a police officer responding to a family violence call drove into an intersection against a red light and collided with another vehicle. *Johnson*, 142 S.W.3d 592, 594–95 (Tex.App.-Texarkana 2004, pet. denied). The officer offered uncontroverted evidence that a reasonably prudent officer under the same or similar circumstances could have believed the course of action was reasonable because the need to respond outweighed any clear risk of harm to the public. *Id.* at 595. Although the plaintiff in *Johnson* offered evidence that the officer behaved recklessly, the reviewing court held that "[r]ecklessness is negligence, and negligence is immaterial when determining if an officer acted in good faith." *Id.* at 596.

We do not agree that negligence and recklessness are synonymous, nor do we agree with the *Johnson* court's implication that evidence of recklessness is immaterial to a determination of good faith. Moreover, *Johnson* is distinguishable on the facts; unlike here, it appears that the plaintiff in *Johnson* offered no evidence controverting the officer's assertion that a reasonable officer could have believed his conduct was justified. Here, however, Green's own expert agreed that no reasonable fire fighter could have believed it was reasonable to drive the fire truck without required corrective lenses if other firefighters were available.[18]

Green also relies on *Rivas v. City of Houston*, in which we affirmed the trial court's rendition of judgment notwithstanding the verdict. 17 S.W.3d 23, 29 (Tex.App.-Houston [14th Dist.] 2000) (op.

on reh'g); 19 S.W.3d 901 (Tex.App.-Houston [14th Dist.] 2000, pet. denied) (supp. op. on second mot. for reh'g). In that case, paramedics were transporting a patient who became increasingly combative, loosened his restraints, and fell off a gurney in the ambulance. 17 S.W.3d at 26. The defendant driver stopped the ambulance repeatedly to allow paramedics to restrain the patient. *Id.* The transport was upgraded to emergency status, and while crossing an intersection against a red light, the ambulance collided with the plaintiff's truck. *Id.* There was no evidence that the ambulance's siren was activated, and conflicting evidence regarding whether its emergency lights were on. *Id.* We concluded that the driver established his good faith as a matter of law. *Id.* at 28–29.

Significantly, however, the standard of good faith applied in *Rivas* differed from that announced in *Chambers* and further explained in *Wadewitz*. Instead, the jury in *Rivas* was instructed without objection as follows:

> [The defendant ambulance driver] acted in "good faith" if a reasonably prudent ambulance driver, under the same or similar circumstances, could have believed that the need to immediately take the patient to the hospital outweighed a clear risk of harm to the public *in proceeding past a red or stop signal without slowing down as may be necessary for safe operation.*

*Id.* at 27 (emphasis added). Because the appellant in *Rivas* did not object to this definition of "good faith," the legal sufficiency of the evidence was measured against the standard recited in the jury charge. *See Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex.2000) ("[I]t is the court's

---

**18.** Because the judgment is supported by expert testimony, we do not reach the dissent's discussion of whether expert testimony is required.

charge, not some other unidentified law, that measures the sufficiency of the evidence when the opposing party fails to object to the charge.").

By instructing the jury to consider only certain matters in determining good faith, the trial court in *Rivas* restricted the factors to be balanced in the need/risk assessment.[19] Significantly, the jury was not required to consider the driver's awareness of the risks posed by failure to use a siren or emergency lights. Consequently, the jury was guided away from consideration of all the factors comprising "the same or similar circumstances."

Here, however, we are not presented with a jury charge that omits factors relevant to the need/risk analysis. This was a nonjury trial, and the trial court could consider all relevant facts in deciding "whether a reasonably prudent official, *under the same or similar circumstances,* could have believed that his conduct was justified based on the information he possessed when the conduct occurred." *Ballantyne,* 144 S.W.3d at 426 (emphasis added); *cf. Clark,* 38 S.W.3d at 579 (holding that the *Wadewitz* factors apply to good faith determinations in police pursuit cases). And in reviewing the trial court's judgment, we likewise consider all of the evidence, indulge every reasonable inference that would support the verdict, and disregard contrary evidence unless a reasonable fact-finder could not. *City of Kel-*

*ler,* 168 S.W.3d at 827. Consequently, *Rivas* does not guide our review of this case.

Because the evidence is legally sufficient to establish that Green was not operating the fire truck in good faith at the time of the accident, we conclude the trial court did not err in denying Green's motion for judgment as a matter of law. We therefore overrule Green's first issue.

### B. Recklessness

 In his second issue, Green contends the evidence is legally and factually insufficient to support four specific factual findings in connection with the trial court's conclusion that his conduct was reckless. In the alternative, he argues that the findings do not support the conclusion that he was reckless. The trial court's finding of recklessness is significant because under section 546.005 of the Transportation Code, the driver of an emergency vehicle is not relieved from "the duty to operate the vehicle with appropriate regard for the safety of all persons" or "the consequences of reckless disregard for the safety of others." Tex. Transp. Code Ann. § 546.005 (Vernon 1999). This provision "imposes a *duty* to drive with due regard for others by avoiding negligent behavior, but it only imposes *liability* for reckless conduct." *City of Amarillo v. Martin,* 971 S.W.2d 426, 431 (Tex.1998) (interpreting predecessor provision).[20]

#### 1. *Standard of Review*

---

19. Under the charge as given, "need" was measured by the need to take the patient to the hospital immediately and did not require the jury to consider the driver's awareness of other available courses of action. *Cf. Wadewitz,* 951 S.W.2d at 467. Similarly, "risk" considerations were restricted to the possible harm to one category of people (the public) posed by the combination of two acts by the driver (failure to stop and failure to slow sufficiently). The jury was not required to consider the driver's awareness of the risks

his actions posed to the patient or other paramedics. *Cf. id.*

20. Although the dissent states that Chief Gardner's testimony that Green proceeded with due regard "comes close to creating a fact issue," due regard forms no part of the test for immunity or liability. Proof of due regard does not establish good faith, and proof of its absence does not establish recklessness. Thus, testimony concerning due regard does not create a fact issue on either issue.

In a nonjury trial, findings of fact have the same force and dignity as a jury's verdict. *Dallas County Constable Precinct No. 5 v. Garden City Boxing Club, Inc.,* 219 S.W.3d 613, 615–16 (Tex. App.-Dallas 2007, no pet.). When a complete reporter's record is filed, we review the trial court's findings of fact for legal and factual sufficiency under the same standards we apply to jury verdicts. *See Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex. 1996) (per curiam). In doing so, we do not substitute our judgment for that of the factfinder, even if we would have reached a different conclusion when reviewing the evidence. *FDIC v. F & A Equip. Leasing,* 854 S.W.2d 681, 684–85 (Tex.App.-Dallas 1993, no writ).

We review the evidence for legal sufficiency under the previously-described standard set forth in *City of Keller.* In addition, a party challenging the factual sufficiency of a finding on which that party bore the burden of proof at trial must demonstrate that the adverse finding is against the great weight and preponderance of the evidence. *Dow Chem.,* 46 S.W.3d at 242. In reviewing a factual sufficiency challenge, we consider and weigh all the evidence in a neutral light and may set aside the finding only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Id.*

### 2. Sufficiency of the Evidence to Support Factual Findings

To prevail against the driver of an emergency vehicle, a claimant must show that the driver committed acts or omissions that the driver knew or should have known posed a high degree of risk of serious injury. *Martin,* 971 S.W.2d at 430. This test is designed to address concerns that

the possibility of incurring civil liability for what amounts to a mere failure of judgment could deter emergency personnel from acting decisively and taking calculated risks in order to save life or property or to apprehend miscreants. The "reckless disregard" test, which requires a showing of more than a momentary judgment lapse, is better suited to the legislative goal of encouraging emergency personnel to act swiftly and resolutely while at the same time protecting the public's safety to the extent practicable.

*Id.* (quoting *Saarinen v. Kerr,* 84 N.Y.2d 494, 620 N.Y.S.2d 297, 644 N.E.2d 988, 992 (1994)).

In connection with his challenge to the recklessness finding, Green disputes the following adverse findings of the trial court:

22. Defendant Christopher Green was not wearing corrective lenses when driving the fire truck at the time of the collision.

26. Defendant Christopher Green did not slow the speed of the fire truck as necessary for safe operation before he entered the intersection in which the collision occurred.

27. Driving a fire truck weighing 39,-500 pounds into an intersection with heavy cross traffic, such as the traffic on westbound Fairmont Parkway during evening rush hour, against a red light governing the fire truck's direction of travel, at a speed of approximately 23 miles per hour, without being able to first see that all of the lanes of cross traffic had yielded to the fire truck poses a high degree of risk of serious injury; prior to the collision, defendant Christopher Green had actual awareness that such action

posed a high degree of risk of serious injury.

52. At the time of the collision the operator of the fire truck was not using the fire truck's siren or other audible warning signal.

In addition, Green argues that the trial court did not expressly tie the challenged findings to the issue of recklessness or specify which factual findings supported the conclusion that he was reckless. But, Green cites no authority for the proposition that the trial court is required to include such statements in its findings of fact and conclusions of law. *See* TEX.R. CIV. P. 298, 299 (addressing additional, amended, and omitted findings). The trial court is required to make additional findings of fact or conclusions of law only if requested, and only if the requested material relates to an ultimate or controlling issue rather than an evidentiary matter. *See Rafferty v. Finstad*, 903 S.W.2d 374, 376 (Tex.App.-Houston [1st Dist.] 1995, writ denied). Green does not contend that these conditions are satisfied here. Thus, we presume the trial court found omitted, unrequested findings consistent with its judgment if other elements of the same ground of defense or recovery are included in the trial court's findings and the presumed findings are supported by the evidence. TEX.R. CIV. P. 299; *Black v. Dallas County Child Welfare Unit*, 835 S.W.2d 626, 630 n. 10 (Tex.1992); *In re K.R.P.*, 80 S.W.3d 669, 673 (Tex.App.-Houston [1st Dist.] 2002, pet. denied).

**a. Failure to Wear Corrective Lenses**

Green asserts that Finding No. 22 is not supported by legally and factually sufficient evidence, but this argument cannot be sustained. Although Green testified that he was wearing glasses at the time of the accident, this testimony was refuted by other evidence. Lawhorn, who was seated beside Green at the time of the accident, testified that he has known Green since 1998 or 1999 and has never seen him wear glasses (other than safety glasses). According to Lawhorn, Green was not wearing glasses on this occasion. Gardner offered similar testimony. Green identified himself in photographs taken at the scene, and he was not wearing glasses in the photographs. Despite Green's testimony to the contrary, we conclude the evidence is legally and factually sufficient to support the trial court's finding that Green was not wearing corrective lenses at the time of the accident.

Green next argues that this factual finding does not support the trial court's conclusion that he was reckless. In support of this argument, he relies on *Kolster v. City of El Paso*[21] for the proposition that the failure of an emergency-vehicle driver to wear required corrective lenses shows only negligence. But in *Kolster*, the jury was asked only if an ambulance driver's failure to wear glasses was negligent;[22] thus, negligence was the only standard applied. *See Osterberg*, 12 S.W.3d at 55 (holding that when there is no objection to a defective jury charge, the sufficiency of the evidence must be measured against the charge). Because the City of El Paso failed to preserve error regarding the submission of a simple negligence standard rather than the recklessness standard, the issue of recklessness was not addressed. *Kolster*, 972 S.W.2d at 59.

 Green also points to his doctor's testimony that keratoconus did not contribute to his failure to see the Alfords' vehicle. But when making this statement,

**21.** 972 S.W.2d 58 (Tex.1998).

**22.** *Id.* at 59.

Dr. Mayo was asked to assume that Green was wearing glasses. "And if an expert's opinion is based on certain assumptions about the facts, we cannot disregard evidence showing those assumptions were unfounded." *City of Keller*, 168 S.W.3d at 813.

In addition, Green relies on Mayo's statement that keratoconus "does not keep or disturb peripheral vision from seeing large objects.... So, I do not believe his keratoconus would have kept him from seeing a vehicle coming perpendicular." This statement does not affect our analysis. First, both Green and Lawhorn testified that Green looked to his right, in the direction of the northernmost westbound lane of Fairmont Parkway. The factfinder can infer that by turning his head to face the lane, Green moved the image of the lane from the peripheral portion of his field of vision to the central, blurred portion of his visual field. Moreover, Green's ability to detect large objects using his peripheral vision would not necessarily help him to avoid collisions with large objects directly in front of him, as happened here.

In any event, Green's argument that his failure to wear corrective lenses is not evidence of recklessness is without merit. Although driving a fire truck through an intersection against a red light in rush hour traffic on a holiday weekend requires the rapid, accurate, and continual assessment and reassessment of the relative locations of the other vehicles on both streets, Green not only undertook this exercise without slowing as necessary for safe operation, but chose not to wear the lenses required to correct his blurred and decreased distance vision. According to the facts as found by the trial court, he did so despite the fact that other firefighters were available to drive. He then entered the northernmost westbound lane of Fairmont at a speed that did not enable him to stop before striking any cross-traffic that might be in the lane, and did so despite the fact that he did not see that lane.[23] On these facts, together with testimony of Green and Stage acknowledging the high degree of risk of serious injury, a reasonable factfinder could conclude that Green knew or should have known that his conduct exposed himself, his fellow firefighters, and the general public to a high degree of risk of serious injury.

Considering the totality of the evidence, we do not find Green's arguments persuasive. Green acknowledged that there was a high degree of risk of serious injury if the fire truck collided with a smaller vehicle. The trial court found that Green's conduct proximately caused the Alfords' injuries and found that Green's conduct was reckless. The trial court was neither requested nor required to list all evidence supporting the causation finding and did not do so.

#### b. Failure to Slow for Safe Operation

Green argues that Finding No. 26 is contradictory to his testimony and to the testimony of firefighter Lawhorn and southbound driver Vaught, each of whom testified that Green slowed before entering the intersection. Green further argues that because three other witnesses testified only that they did not see the fire truck's brake lights, their testimony is not

---

23. In Finding No. 14, the trial court wrote, "Prior to the collision, defendant Christopher Green did not see the northernmost lane of westbound Fairmont Parkway." Although the trial court wrote in Finding No. 15 that Green's view of that lane was impaired due to traffic, the trial court did not specify the reason for the separate and additional finding that Green "did not see" the lane.

probative of whether or not he actually slowed the fire truck. We disagree.

■ Evidence is "probative" if it logically tends to make a particular proposition of consequence to an issue at trial either more or less likely. *Boswell v. Brazos Elec. Power Co-op., Inc.*, 910 S.W.2d 593, 601 n. 3 (Tex.App.-Fort Worth 1995, writ denied). And with certain exceptions inapplicable here, vehicles operated on Texas roads must be equipped with at least one brake light mounted on the rear of the vehicle that emits a red or amber light visible in normal sunlight for at least 300 feet when the vehicle's brakes are applied. TEX. TRANSP. CODE ANN. § 547.323 (Vernon 1999). Testimony that a witness did not see illuminated brake lights on a moving vehicle is some indication that the driver was not applying the brakes at that time.

On the other hand, even uncontroverted evidence that Green applied the fire truck's brakes is not conclusive evidence that he slowed "as necessary for safe operation." *Cf. id.* § 546.001(2) (authorizing an emergency vehicle operator to proceed past a red traffic signal or stop sign "after slowing as necessary for safe operation"). The trial court could have found that Green applied the brakes before entering the intersection but was traveling at such a high rate of speed that he could not slow "as necessary for safe operation." This inference is supported by the testimony of Schlueter and Stage, among others.

Because there is more than a scintilla of evidence that Green failed to slow "as necessary" before entering the intersection, the evidence is legally sufficient to support the trial court's finding. In addition, the

finding is not contradicted by the great weight and preponderance of the evidence. We therefore conclude that the evidence supporting the finding is factually sufficient. We further determine that Green's failure to slow to for safe operation of the fire truck is another factor supporting the conclusion that his conduct was reckless. *See City of Amarillo v. Pruett*, 44 S.W.3d 702, 706 (Tex.App.-Amarillo 2001, pet. denied) (factfinder could consider officer's speed and traffic conditions in determining recklessness).

**c. Actual Awareness of High Degree of Risk of Serious Injury**

In Finding No. 27, the trial court found that Green had actual awareness that driving the fire truck at 23 miles per hour into an intersection with heavy cross-traffic against a red light without being able to first see that all of the lanes of traffic had yielded posed a high degree of risk of serious injury. Although Green contends that the evidence supporting this finding is legally and factually insufficient, he does not specifically challenge any of the facts recited in this finding. Instead, he contends that his failure to secure the northernmost lane of westbound Fairmont was not reckless.

In support of this argument, Green states that "emergency vehicle operators are entitled to proceed against red lights even though *some* risk exists." Here, however, we are not concerned with conduct that posed "some risk," but with conduct that Green knew or should have known posed a "high degree of risk of serious injury." That is the applicable test for recklessness under Texas law. *Martin*, 971 S.W.2d at 430–31.[24]

---

24. Green asserts that courts addressing circumstances similar to those presented here have concluded the driver's conduct was not reckless. In support of this contention, he

first cites *Badalamenti v. City of New York*, No. 12648/01, 2005 WL 287390, at *2 (N.Y.Sup. Jan. 24, 2005). According to Green, this case is illuminating because the

Under the same heading, Green argues that, in reviewing the evidence of recklessness, we are barred from considering the testimony of Robert Stage. According to Green, Stage's testimony is of no probative force because Stage holds Green to an improper legal standard in that he testified that a firefighter is required to secure all lanes of cross-traffic. Again, we disagree. Stage testified that Green should have known that failure to secure all lanes of cross-traffic posed a high degree of risk of serious injury. This uncontroverted testimony addresses the correct legal standard for recklessness under Texas law.[25]

Thus, the evidence is legally and factually sufficient to support the conclusion that Green should have known of the high de-gree of risk of serious injury posed by crossing this intersection against the light during rush hour of a holiday weekend without securing a lane of traffic that crossed the intersection at 45 miles per hour.

### d. Failure to Use a Siren

In arguing that the evidence is insufficient to support the finding that he failed to use a siren, Green points out that firefighter Lawhorn and four other bystanders agree with his own testimony that the fire truck's siren was activated. Nevertheless, the Alfords and four other witnesses did not hear a siren, and although a witness might fail to hear a siren for a variety of reasons, such failure nevertheless is

---

court determined that a police officer's "failure to come to a full stop prior to entering the intersection with his vision partially obscured does not, standing along [sic], render his conduct reckless, even if . . . his turret lights and siren were not in use."

> *Badalamenti*, however, has been reversed:
> Here, the parties' evidentiary submissions indicate that the defendant police officer did not stop at the stop sign which controlled the intersection where the accident occurred, that his view of the intersection was partially obstructed by a parked truck, and that he accelerated his speed upon entering the intersection. In addition, there are disputed issues of fact as to whether the defendant police officer activated the turret lights and siren on his vehicle before proceeding into the intersection. Under these circumstances, the *defendants are not entitled to judgment as a matter of law on the issue of whether the defendant police officer was operating his vehicle in reckless disregard for others at the time of the accident.*
> 30 A.D.3d 452, 817 N.Y.S.2d 134, 135 (2006) (emphasis added).

Green further contends that "New York's application of the recklessness test is particularly compelling, as *Martin* relied expressly on New York authority in establishing the Texas standard." This argument is unpersuasive. Although New York and Texas courts both use similar terms, Texas measures recklessness differently. For example, Green re-lies in part on *Salzano v. Korba*, 296 A.D.2d 393, 745 N.Y.S.2d 56, 57 (2002). But the *Salzano* court explained that, under New York law, liability for an officer's performance of a discretionary duty is imposed only for

> "reckless disregard" for the safety of others, which is defined as the conscious or intentional "doing of an act of an unreasonable character in disregard of a known or obvious risk so great as to make it highly probable that harm would follow" and done with conscious indifference to the outcome.

*Id.* (citations omitted). This is not the standard in Texas. Green similarly relies on a Mississippi case, which, like the New York cases he cites, imposes liability only for a different measure of "reckless disregard" of public safety. *See Kelley v. Grenada County*, 859 So.2d 1049, 1053 (Miss.App.2003) ("Our case law indicates 'reckless disregard' embraces willful or wanton conduct which requires knowingly and intentionally doing a thing or wrongful act." (quoting *Turner v. City of Ruleville*, 735 So.2d 226, 229–30 (Miss. 1999))). Further, none of the cases on which Green relies present the combination of facts presented here, including Green's failure to wear corrective lenses as he was required by law to do when operating any motor vehicle.

25. Moreover, the trial court could have concluded that Green was driving at a speed that posed a high degree of risk of serious injury even without considering Stage's testimony.

some evidence that there was no siren to be heard. *See City of El Paso v. Higginbotham,* 993 S.W.2d 819, 825–26 (Tex.App.-El Paso 1999, no pet.) (holding that witnesses' testimony that they heard no siren defeats summary judgment regarding ambulance driver's good faith because there was no evidence that the driver could have believed that running a red light without using the siren was justified). In addition, Chief Gardner testified that there is a recording of the radio transmissions from the fire truck, and that if a firefighter is transmitting while the siren is on, the siren can be heard on the radio transmission; however, he admits that no siren can be heard on the radio transmissions made from Engine 81. Although Green contends that the failure of some witnesses to hear the siren is not probative of whether the siren was activated, this argument does not explain why the sound of a siren failed to register on a recorded transmission.

We conclude that, viewed in the light most favorable to the trial court's finding, the evidence is sufficient to allow reasonable people to disagree about Green's use or non-use of the siren; thus, the evidence is legally sufficient to support the finding. Moreover, viewed in a neutral light, the finding is not against the great weight and preponderance of the evidence. We therefore conclude that the evidence also is factually sufficient to support the trial court's finding.

Green next contends that the failure to use a siren when entering an intersection against the light does not support a finding of recklessness. In support of this argument, he relies on *Smith v. Janda,* 126 S.W.3d 543 (Tex.App.-San Antonio 2003, no pet.). In *Smith,* the Fourth Court of Appeals held as a matter of law that an ambulance driver who approached an intersection with the vehicle's lights and sirens activated and slowed before the intersection was not reckless. *Id.* at 546. The court reasoned that " 'an emergency vehicle operator responding to an emergency call is allowed to proceed against a red traffic light *after slowing for safe operation.*' " *Id.* (emphasis added) (quoting *Flores v. City of San Antonio,* No. 04-99-00555–CV, 2000 WL 767871, at *4 (Tex. App.-San Antonio June 14, 2000, pet. denied) (not designated for publication)); *see also Flores,* 2000 WL 767871, at *4 ("[E]mergency vehicle operators are insulated under Chapter 546 from conduct short of recklessness, for proceeding through a red light *after slowing for safe operation with audible or visual signals* activated." (emphasis added) (citing *Hale v. Pena,* 991 S.W.2d 942, 946–47 (Tex.App.-Fort Worth 1999, no pet.))). Here, however, the factfinder concluded that Green did not slow as necessary for safe operation before entering the intersection. Thus, *Smith* is inapposite.

Green further argues that he was entitled to presume that other vehicles would yield to the fire truck. In support of this argument, he relies on the following language from the Texas Supreme Court's decision in *Martin:* "It is unfortunate that some civilian drivers are less than vigilant in abiding by their duties to keep a lookout for and to yield to emergency vehicles, but emergency vehicle operators are entitled to presume that other drivers will respect emergency priorities." [26] *Martin,* 971 S.W.2d at 432. But the court further rea-

---

26. Here, however, the trial court did not find that Ronald Alford was "less than vigilant" or failed to keep a proper lookout. To the contrary, the trial court found that "Ronald Alford operated his vehicle in a manner that a person of reasonable and ordinary prudence would have under the same or similar circumstances," and Green does not challenge this finding.

soned that "civilian drivers generally have an advantage when it comes to anticipating and preventing a collision. Under most circumstances, the lights, sirens, and distinctive coloring of an emergency vehicle make it stand out from the others...." *Id.*

Unlike the circumstances described in *Martin,* Alford's view was blocked, and under the facts as found by the trial court, Green chose not to use a siren. Consequently, it was Green rather than Alford who had "an advantage in anticipating and preventing a collision." Under the facts as found by the trial court, Green knew that a green light faced the heavy cross-traffic; that traffic could cross his path at 45 miles per hour; and that his vision was blurred and his distance vision was decreased. He had the option to wear his glasses, allow someone else to drive, use the siren, or slow down or stop before entering the lane. The Alfords, on the other hand, had no reason to expect that Green was about to drive into their lane against the light at a speed that would not allow him to stop before colliding with anything else in the intersection. We therefore conclude that under the record and the supported findings of fact, Green's failure to use a siren is a factor supporting the conclusion that Green's behavior was reckless.

In sum, we conclude legally and factually sufficient evidence supports the challenged findings. Further, these findings support the trial court's conclusion that Green's conduct was reckless. Accordingly, we overrule Green's second issue.

## C. Limitation of Liability

■ In his final issue, Green raises an issue of first impression: is a public servant "covered" by insurance "for [an] amount not in excess of $100,000" if the insurance policy is subject to a $100,000 self-insured retention? Specifically, Green challenges the trial court's refusal to apply the damages cap set forth in section 108.002(a)(2)(C) of the Texas Civil Practice and Remedies Code, which provides:

> [A] public servant *is not personally liable for damages in excess of $100,000 arising from personal injury . . . if* the damages are the result of an act or omission by the public servant in the course and scope of the public servant's . . . service on behalf of a . . . local government; and *for the amount not in excess of $100,000, the public servant is covered by liability or errors and omissions insurance. . . .*

TEX. CIV. PRAC. & REM.CODE ANN. § 108.002(a)(2)(C) (Vernon 2005) (emphasis added). Green contends that because he is an assured under a liability and errors and omission insurance policy issued to the City of Pasadena, section 108.002 caps his liability as a matter of law.

■ The construction of a statute is a question of law, which we review de novo. *F.F.P. Operating Partners, L.P. v. Duenez,* 237 S.W.3d 680, 683 (Tex.2007). If an insurance policy provision has only one reasonable interpretation, it is unambiguous, and we must construe it as a matter of law. *Fiess v. State Farm Lloyds,* 202 S.W.3d 744, 746 (Tex.2006). As used in section 108.002, a "public servant" includes a volunteer of a local government.[27] There is no dispute that Green's work as a volunteer firefighter for the City of Pasadena is encompassed within this definition. The parties also agree that the City of Pasadena is the named insured on a liability

27. *See id.* §§ 108.001(1)(B) (defining "public servant" as a person covered by section 102.001 of the Civil Practice and Remedies Code), 102.001(1) (defining "employee" to include a volunteer of a local government).

and errors and omissions policy, and the policy defines the term "assured" to include the City's volunteers while acting within the scope of their duties. In addition, the parties agree that the City's insurance policy is unambiguous and can be construed as a matter of law. They also do not dispute that the accident occurred while Green was acting within the scope of his duties.[28] Finally, it is undisputed that the City's insurance policy is subject to a $100,000 self-insured retention ("SIR"). The parties disagree, however, on how section 108.002 applies to these facts.

### 1. Interpretations Presented

The Alfords argue that, regardless of whether coverage was potentially available for amounts in excess of $100,000, Green was not "covered" "for the amount not in excess of $100,000" because coverage is subject to a $100,000 SIR, and (a) "self-insurance is not insurance"; (b) as an assured, Green is responsible for paying the $100,000 SIR, and he therefore derives no benefit from the SIR requirement; (c) the policy imposes no obligation on the City to pay the SIR on Green's behalf; and (d) the Alfords' automobile insurer agreed that the SIR is an "uninsured gap in coverage."

The trial court concluded that section 108.002 did not apply to Green for two reasons. First, "[a]t the time of the collision, for the amount not in excess of $100,000.00, defendant Christopher Green was not covered by liability or errors and omissions insurance; he was only covered under the City of Pasadena policy for the amount above $100,000.00 to $1,000,000.00." Second, "under § 102.002(c)(2) of the Texas Civil Practice[ ] and Remedies Code, the City of Pasadena is not authorized to indemnify defendant Christopher Green, pursuant to

§ 108.002(a)(2)(B) of the Texas Civil Practice[ ] and Remedies Code, because defendant Christopher Green's conduct constituted gross negligence." Section 102.002(c)(2) of the Civil Practice and Remedies Code provides that, with certain exceptions inapplicable here, "a local government may not pay damages awarded against an employee that arise from a cause of action involving a wilful or wrongful act or omission or an act or omission constituting gross negligence." *Id.* § 102.002(c)(2).

Green does not challenge the trial court's conclusion that, by statute, the City is not authorized to indemnify him. Nevertheless, he contends that because he is an "assured" and the accident was an "occurrence" or "wrongful act," coverage for him was triggered under the policy. He asserts that he "has a contractual right of indemnity under the policy such that the City must provide the first $100,000 of indemnity before the insurance company must provide the remainder up to the policy limit." Thus, Green urges us to construe both the statutes and the policy de novo, conclude that the policy affords him $100,000 of coverage, and render judgment that he is entitled to statutory limitation of liability as a matter of law.

### 2. Comparison of Section 108.002(a)(2)(C) and the Policy

Under the terms of the section 108.002(a)(2)(C), the liability of a public servant for personal injury damages is limited to $100,000 if "for the amount not in excess of $100,000, the public servant is covered by liability or errors and omissions insurance...." Our inquiry does not focus on whether some accidents "may be" covered or whether the actor is in-

---

**28.** The carrier, however, is not a party to this suit, and its position regarding coverage is not part of the record.

sured for amounts exceeding $100,000. *See Brooks v. Northglen Ass'n,* 141 S.W.3d 158, 169 (Tex.2004) ("When construing a statute, the Court must presume that every word of the legislation has meaning."). Rather, to satisfy the terms of the statute, the first $100,000 of personal injury damages—i.e., the amount "not in excess" of $100,000—must be "covered" under a liability or errors and omissions policy.

The policy's terms, however, describe its coverage as "excess" insurance above a $100,000 self-insured retention. The SIR is defined as "that dollar amount specified in the Schedule of Self[-]Insured Retentions which the Assured is obligated to pay because of loss or damage covered under any Section of this policy, *before this policy indemnifies the Assured* for the same loss." (emphasis added).[29] The carrier "is liable only for the Ultimate Net Loss in excess of the applicable Self[-]Insured Retention, and not more than the Excess Limit of Insurance."[30] The carrier has no duty to defend.

The policy requires the "assured" to pay the $100,000 SIR, and as a volunteer, Green is included in the definition of "assured." Thus, "for the amount not in excess of $100,000," the policy does not shift the risk of defense costs, investigative expenses, or adverse judgment from Green to the carrier or even to the City. *Cf. Stewart Title Guar. Co. v. Cheatham,* 764 S.W.2d 315, 318–19 (Tex.App.-Texarkana 1988, writ denied) (explaining that an insurer "assumes particular risks" of the insured).[31] To the contrary, the requirement that an "assured" pay the SIR applies equally to both Green and the City. *See* 1 ALLAN D. WINDT, INS. CLAIMS & DISPUTES § 11.31, at 348–50 (3d ed. 1995) ("[P]roperly viewed, a self-insured retention does not constitute insurance .... [but instead] represents the amount of the loss that the insured is responsible for before the coverage is triggered."); *see also Hertz Corp. v. Robineau,* 6 S.W.3d 332, 335 (Tex.App.-Austin 1999, no pet.) (Under Texas law, "self-insurance is not 'other insurance.'").

In sum, Green contends, "If the City pays the first $100,000, Green is covered." But section 108.002 is concerned only with that "first $100,000." *See* TEX. CIV. PRAC. & REM.CODE ANN. § 108.002(a)(2)(C) (liability is limited if the public servant is covered by liability insurance "for the amount *not in excess* of $100,000" (emphasis added)).

---

**29.** For readability, full capitalization has been changed to initial capitalization.

**30.** "Ultimate net loss" is defined to include: hospital, medical and funeral charges and all sums paid as salaries; wages; compensation; fees; expenses for doctors, nurses, and legal; premium on attachment, appeal or similar bonds (but without any obligation on the part of the [insurer] to apply for or furnish such bonds); expenses of lawyers and investigators and other persons and for litigation, settlement, adjustment and investigation of claims and suits which are paid as a consequence of any loss or damage covered hereunder.

**31.** *See also Chambi v. Regents of Univ. of Cal.,* 95 Cal.App.4th 822, 826, 116 Cal.Rptr.2d 50, 53 (2002):

It is axiomatic that self-insurance is not insurance. An "allegation of self-insurance, which is equivalent to no insurance, is repugnant to the concept of insurance which fundamentally involves the shifting to a third party, by contract, for a consideration, the risk of loss as a result of an incident or event."
(quoting *Richardson v. GAB Bus. Servs., Inc.,* 161 Cal.App.3d 519, 523, 207 Cal.Rptr. 519, 521 (1984)); *Physicans Ins. Co. of Ohio v. Grandview Hosp. & Med. Ctr.,* 44 Ohio App.3d 157, 158, 542 N.E.2d 706, 707 (1988) ("[S]elf-insurance is not insurance; it is the antithesis of insurance. Insurance shifts the risk of loss from an insured to an insurer. Self-insurance 'is the retention of the risk of loss by the one upon whom it is directly imposed by law or contract.'").

Thus, coverage in excess of $100,000 is not at issue.

An additional problem with Green's argument is manifested in his use of the word "if." This word denotes an uncertain possibility, not an obligation, and Green failed to establish that anyone has an obligation to him to pay the first $100,000 of damages assessed against him as a result of this claim.[32] This uncertainty is magnified by the trial court's finding that Green was grossly negligent and the City of Pasadena therefore is not authorized to pay damages awarded against him. *See id.* § 102.002(c)(2) (providing that a local government may not pay damages arising from an act or omission that constitutes gross negligence). Green does not contest the finding that he was grossly negligent or the trial court's conclusion regarding the application of section 102.002. He cites no evidence or authority in support of the contention that the City nevertheless has an obligation to "provide the first $100,000 of indemnity" as Green alleges. He produced no evidence that he contracted with the City to satisfy the SIR obligation necessary to trigger the carrier's duty to indemnify, and the policy itself does not define the obligations between assureds. *See Helmerich & Payne Int'l Drilling Co. v. Swift Energy Co.*, 180 S.W.3d 635, 641–42 (Tex.App.-Houston [14th Dist.] 2005, no pet.) (holding that the language of a comprehensive general liability policy imposed no contractual obligation on the named assured to reimburse additional assured for claims within the deductible amount). Moreover, this argument cannot be reconciled with the trial court's uncontested conclusion that, by statute, the City is not authorized to indemnify Green. In sum, the policy does not require the insurer to indemnify Green, and section 102.002 does not authorize the City to indemnify him.

On this record, we conclude Green failed to establish that he "is covered" by liability or errors and omissions insurance "for the amount not in excess of $100,000" as those terms are used in section 108.002. We therefore overrule Green's third issue, and we do not reach the broader question of whether a self-insured retention constitutes "insurance" in a more general sense.

## IV. CONCLUSION

We hold that Green failed to conclusively establish that he was acting in good faith at the time of the accident. We further determine that the evidence is legally and factually sufficient to support the challenged findings and the judgment. Finally, we conclude that Green failed to establish, as a matter of law, that he is covered by liability insurance for an amount not exceeding $100,000 as required by section 108.002 of the Civil Practice and Remedies Code. Having overruled each of the three issues presented on appeal, we affirm the trial court's judgment.

FROST, J., concurring.

HUDSON, J., dissenting.

KEM THOMPSON FROST, Justice, concurring on en banc rehearing.

I join in the en banc court's judgment, but I respectfully disagree with both the

---

**32.** As we have previously pointed out, the issue of whether an insured has satisfied a self-insured retention presents a question of fact. *Lennar Corp. v. Great Am. Ins. Co.*, 200 S.W.3d 651, 685–86 (Tex.App.-Houston [14th Dist.] 2006, pet. denied). Green cites no evidence that the City has voluntarily paid or agreed to pay the SIR on his behalf, and the record does not establish these facts; thus, we are not confronted with the question of whether Green would be considered "covered by liability insurance" under such circumstances.

majority's description of the legal standard applicable to the official immunity analysis and the majority's decision to address whether the record contains sufficient evidence that no reasonable person in Green's position could have believed that the facts justified his conduct.

## Legal Standard Applicable to Official Immunity Analysis

In his first issue, Green argues that the trial court erred by denying his motion for judgment as a matter of law. In that motion, Green asserted that the evidence at trial conclusively proved his defense of official immunity. To sustain this issue, this court would have to conclude that the evidence at trial conclusively proved that Green acted in good faith.[1] To determine whether Green acted in good faith, this court must use the objective standard adopted in *City of Lancaster v. Chambers*[2] and ask whether a reasonably prudent official, under the same or similar circumstances, could have believed that his conduct was justified based on the information he possessed when he engaged in the conduct.[3]

Good faith depends on how a reasonably prudent official could have assessed both the need to which the official was responding and the risks of the official's course of action, based on the official's perception of the facts at the time of the event.[4] The "need" aspect of the test refers to the urgency of the circumstances requiring an emergency response, and need is determined by factors such as the seriousness of the incident to which the official is responding, whether the official's immediate presence is necessary to prevent injury or loss of life, and what alternative courses of action, if any, are available to achieve a comparable result.[5] The "risk" aspect of good faith, on the other hand, refers to the countervailing public safety concerns: the nature and severity of harm that the official's actions could cause (including injuries to bystanders as well as the possibility that an accident would prevent the official from reaching the scene of the emergency), the likelihood that any harm would occur, and whether any risk of harm would be clear to a reasonably prudent official.[6] If the record contains conflicting evidence regarding the circumstances upon which this objective determination of good faith is based, then, for the record to show good faith, it must contain evidence that proves good faith under the above legal standard based on the circumstances[7] and the official's conduct shown by the legally sufficient evidence favorable to the claimant.[8]

1. *See Ballantyne v. Champion Builders, Inc.*, 144 S.W.3d 417, 423–24 (Tex.2004).

2. 883 S.W.2d 650, 656 (Tex.1994).

3. *See Ballantyne*, 144 S.W.3d at 426.

4. *See Wadewitz v. Montgomery*, 951 S.W.2d 464, 467 (Tex.1997); *Chambers*, 883 S.W.2d at 656.

5. *See Wadewitz*, 951 S.W.2d at 467.

6. *See id.*

7. The majority states that this court should look at "the circumstances concerning risk and need as the evidence indicates [the offi-

cial] perceived them." *See ante* at p. 20. This statement indicates that evidence is relevant only if it shows what the official subjectively perceived. However, under Texas law, courts apply an objective standard and presume that Green perceived the surrounding circumstances found by the trier of fact to exist. *See Harris County v. Smyly*, 130 S.W.3d 330, 334 (Tex.App.-Houston [14th Dist.] 2004, no pet.); *City of Houston v. Davis*, 57 S.W.3d 4, 7 (Tex.App.-Houston [14th Dist.] 2001, no pet.).

8. *See Smyly*, 130 S.W.3d at 334; *Davis*, 57 S.W.3d at 7. The majority states that the evidence must prove good faith under the above legal standard "based on the facts and

## The Official Immunity Analysis

The evidence presented at trial would enable reasonable and fair-minded people to find that the following circumstances existed when Green entered the intersection:

- Green was responding to an automatic fire alarm at a building approximately one-half mile from the fire station, and the overwhelming majority of automatic fire alarms are false alarms or do not require the immediate presence of a firefighter;
- Green has suffered from keratoconus, a progressive eye disease, since at least 1995;
- Approximately ten months before the collision, Green reported to his doctor that he experienced decreased distance vision and blurring, and he refused a special contact lens prescription due to his job as a firefighter;
- On December 9, 2002, Green reported to his eye specialist changes in his visual acuity; he had blurring of his vision and experienced difficulty watching television;
- At the time of the accident, Green was driving the fire truck in violation of a restriction on his driver's license that required him to wear corrective lenses while driving;
- Other firefighters were available to drive the fire truck;
- When Green entered the intersection of Fairmont Parkway and Jana, it was evening rush hour on the Friday beginning Labor Day weekend;
- Green had actual knowledge that traffic would be heavy at this intersection;
- The speed limit on Fairmont Parkway was 45 miles per hour;
- When Green entered the intersection, the traffic light facing him was red;
- The traffic light facing westbound Fairmont Parkway was green;
- The fire truck weighed 39,500 pounds;
- Trucks in the southernmost and middle lanes of westbound Fairmont Parkway impaired Green's view of the northernmost lane of traffic;
- Green did not see the northernmost lane of westbound Fairmont Parkway;
- Green would have been delayed by 15–30 seconds by stopping or slowing as necessary to ascertain that all traffic had yielded.

As to Green's conduct, reasonable and fair-minded people could find, based on the trial evidence, that, while not wearing corrective lenses required by his driver's license, Green drove the fire truck into the northernmost lane of westbound Fairmont Parkway at 23 miles per hour and did not use the fire truck's horn or siren.

Green did not introduce evidence that applied the legal standard for good faith to the above circumstances and the above conduct. Under the applicable legal standard, the record contains no trial evidence that a reasonably prudent official, under circumstances similar to or the same as those stated above, could have believed that engaging in the above-described conduct was justified based on the information Green possessed when he entered the intersection. Therefore, the burden never shifted to the Alfords to present evidence that no reasonable person in Green's posi-

---

reasonable inferences favoring the claimants." *See ante* at p. 17. However, there may be some facts and reasonable inferences favoring the claimants that do not pertain to the official's conduct and the circumstances under which the official engaged in that con-

duct. Therefore, it would be more accurate to state that there must be evidence that proves good faith under the above legal standard based on the circumstances and the official's conduct shown by the legally sufficient evidence favorable to the claimant.

tion could have believed that the facts justified his conduct (hereinafter "Claimant's Burden").[9] Accordingly, this court need not address our dissenting colleague's contention that expert testimony would be necessary for the Alfords to satisfy this burden. Under the applicable standard of review, the evidence presented at trial would enable reasonable and fair-minded people to find that Green did not prove that he acted in good faith.[10]

The cases upon which Green relies are not on point.[11] Green's argument that this court should disregard circumstances or conduct that otherwise would be relevant to the good faith inquiry unless they proximately caused the collision contradicts authority from the Supreme Court of Texas and from this court.[12] For this reason, the trial court did not err in denying Green's motion for judgment as a matter of law, and Green's first issue is properly overruled.

Though the majority acknowledges that this court need not address our dissenting colleague's conclusion that expert testimony would be necessary for the Alfords to satisfy the Claimant's Burden, in an obiter dictum, the majority nevertheless concludes that the testimony of Green's expert, Chief Gardner, satisfies the Claimant's Burden.[13] As our dissenting colleague points out, Chief Gardner did not testify that no reasonable person in Green's position could have believed that the facts justified his conduct.[14] This court need not address whether expert testimony would be necessary for the Alfords to satisfy this burden for another reason. Under the applicable legal standard, the record contains no trial evidence that a reasonably prudent official, under circumstances similar to or the same as those stated above, could have believed that engaging in the above-described conduct was justified based on the information Green possessed when he entered the intersection.[15] Therefore, the Alfords were not required to satisfy the Claimant's Burden in the trial court, and any failure to do so is not grounds for re-

---

9. *See University of Houston v. Clark*, 38 S.W.3d 578, 581 (Tex.2000).

10. *See Clark*, 38 S.W.3d at 587–88 (concluding that evidence did not conclusively prove that public official acted in good faith because there was no evidence addressing whether there were available alternatives to the course of action chosen by the official); *Wadewitz*, 951 S.W.2d at 467 (concluding that evidence did not conclusively prove that public official acted in good faith because there was no evidence addressing the "risk" aspect of good faith); *Smyly*, 130 S.W.3d at 335 (concluding that evidence did not conclusively prove that public official acted in good faith because there was no evidence applying the good-faith legal standard to the circumstances shown by the evidence favorable to the claimant); *Davis*, 57 S.W.3d at 7 (same as *Smyly* ).

11. *See City of San Angelo Fire Department v. Hudson*, 179 S.W.3d 695, 703–07 (Tex.App.-Austin 2005, no pet.) (involving evidence in which there was no conflict as to the circum-

stances and which reflected a high risk from a burning building in which there were adults and children); *Johnson v. Campbell*, 142 S.W.3d 592, 594–96 (Tex.App.-Texarkana 2004, pet. denied) (involving evidence in which there was no conflict as to the circumstances and which reflected a need for an immediate response based on a report of a threat that a woman might be shot); *Rivas v. City of Houston*, 17 S.W.3d 23, 26–29 (Tex. App.-Houston [14th Dist.] 2000, pet. denied) (applying legal standard for good faith significantly different from the standard under Texas law because the jury was charged on that different standard without objection).

12. *See Wadewitz*, 951 S.W.2d at 467; *Chambers*, 883 S.W.2d at 656; *Smyly*, 130 S.W.3d at 335; *Davis*, 57 S.W.3d at 7.

13. *See ante* at p. 20, p. 21, n. 18.

14. *See post* at p. 39.

15. *See Clark*, 38 S.W.3d at 581.

versal on appeal. For this reason, it is unnecessary for this court to address whether expert testimony is required to satisfy the Claimant's Burden or whether Chief Gardner's expert testimony is sufficient to do so.

## Conclusion

It is proper for the en banc court to grant the Alfords' motion for rehearing, to vacate the panel opinion, and to affirm the trial court's judgment.[16]

J. HARVEY HUDSON, Senior Justice, dissenting on en banc rehearing.

The majority opinion concludes that (1) Green had the burden of establishing his affirmative defense of official immunity, (2) the facts necessary to establish official immunity were disputed, and (3) the trier of fact resolved those factual disputes in favor of the Alfords. Thus, Green failed to establish his defense of official immunity, and the judgment is affirmed. The resolution is simple and compelling, but it effectively abolishes the defense of official immunity.

There is no question the Alfords submitted, and the trial court found, sufficient facts to establish that Green acted negligently in proceeding through the intersection as he did. However, the purpose of

the doctrine of official immunity is to protect public officers from civil liability *for conduct that would otherwise be actionable.* See *City of Lancaster v. Chambers,* 883 S.W.2d 650, 653–54 (Tex.1994). In other words, the underlying purpose of official immunity is to free government officials to exercise their duties without fear of damage suits that would consume their time and energy and the threat of which might appreciably inhibit the fearless, vigorous, and effective administration of policies of government. *Borrego v. City of El Paso,* 964 S.W.2d 954, 958 (Tex.App.-El Paso 1998, pet. denied). Thus, evidence of negligent acts does not establish a lack of good faith.[1] "If a government employee acts within the scope of his employment in the performance of a discretionary duty and acts in good faith, he is entitled to official immunity even though his acts are negligent, or even illegal." *Johnson v. Campbell,* 142 S.W.3d 592, 594 (Tex.App.-Texarkana 2004, pet. denied).[2]

To establish his good faith, Green testified that he weighed the need to respond quickly to the alarm against the risk of injury from entering the intersection on a red light. To minimize the risk, Green said (1) he activated his emergency lights and siren before leaving the station; (2) he

---

**16.** As noted in the majority opinion, the trial evidence is legally and factually sufficient to support the challenged findings regarding recklessness. In addition, Green failed to establish, as a matter of law, that he is covered by liability insurance for an amount not exceeding $100,000 as required by section 108.002(a)(2)(C) of the Texas Civil Practice and Remedies Code. Therefore, the second and third issues also lack merit.

**1.** Official immunity is, under certain circumstances, an absolute privilege. It is founded on the theory that the good it accomplishes in protecting the rights of the general public outweighs any wrong or injury which may result to a particular individual. Thus, by

shielding government officials against harassment and inevitable hazards of vindictive or ill-founded damage suits filed in response to actions officials take while fulfilling their official responsibilities, the privilege protects the public interest. This is true even though the privilege may result in individual citizens suffering some pecuniary loss due to the malicious acts of government officials. *Cloud v. McKinney,* 228 S.W.3d 326 (Tex.App.-Austin 2007, no pet.).

**2.** "Thus qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Chambers,* 883 S.W.2d at 656.

slowed down as he approached the intersection; (3) before entering the intersection, he activated his air horn and looked in the direction of approaching traffic; (4) he saw that no vehicles were moving; (5) he believed his view of the far right lane of Fairmont Parkway was not obstructed and, if it had been obstructed, he would have stopped; and (6) he drove slowly enough that he could have stopped in time to avoid an accident if he had seen the Alfords' vehicle. Thus, Green presented sufficient evidence to establish the affirmative defense of official immunity. The majority holds the Alfords offered evidence rebutting Green's assertions and, thus, created a fact issue as to whether he acted in good faith. Having created a fact issue, the majority finds the issue was resolved against Green by the trier of fact. Indeed, the trial judge, acting as the trier of fact in the court below, apparently disbelieved much of Green's testimony because the trial court found that Green (1) did not assess the risk of entering the intersection as he did against the need to respond quickly to the fire alarm, (2) did not activate his siren, (3) did not use his air horn, (4) could not and did not see the far right lane of Fairmont Parkway, (5) and was driving too fast to stop when he entered the intersection.

In addition, the trial court also concluded that Green did not act in good faith because evidence was admitted showing that (1) Green was suffering from a progressive eye disease that principally blurred the vision in his right eye; (2) in 1997 or 1998, Green failed a vision test administered by the Texas Department of Public Safety; (3) Green was required to

wear corrective lenses while driving; and (4) Green was not wearing corrective lenses at the time of the collision. The court further found that Green (as he himself admitted) was aware that the fire alarm was an automatic alarm and that most automatic alarms are later discovered to be false alarms.[3]

While these factual findings may be damning to Green, they do not resolve the critical issue. After a defendant has offered evidence showing he acted in good faith, he is entitled to official immunity as a matter of law *unless* the plaintiff offers some evidence "that no reasonable person" in the defendant's "position could have thought that the facts justified" the defendant's conduct.[4] *See University of Houston v. Clark*, 38 S.W.3d 578, 581 (Tex. 2000). To make this critical showing, the Alfords relied principally upon the testimony of their expert witness, Robert Stage. Stage testified that (1) Green caused the collision; (2) his actions were reckless; (3) he secured the first two lanes of westbound traffic but erred in failing to secure the third lane of traffic; (4) he should have come to a complete stop until he secured the third lane of traffic; and (5) he should have known that his conduct posed a high degree of risk. Stage also testified that, in his opinion, the risk versus need balancing test was not met when Green entered the third lane of traffic without first "securing" it.

Stage's opinion that Green caused the accident is largely undisputed. Moreover, who "caused" the accident is not the relevant issue. The fact that a governmental employee was negligent will not defeat

---

3. Here, the alarm was, in fact, a false alarm.

4. "Once the defendant presents proof that a reasonable [person] in the same or similar circumstances would have taken the same action, the burden shifts to the plaintiff to

show that no reasonable [person] in the defendant's position could have thought the facts were such they justified the defendant's act." *Souder v. Cannon*, 235 S.W.3d 841, 853 (Tex.App.-Fort Worth 2007, no pet.).

good faith. *Telthorster v. Tennell,* 92 S.W.3d 457, 465 (Tex.2002).[5] The fact that Green's conduct may have been "reckless" is also unavailing. Conduct that is clearly reckless may be reasonable in a time of crisis. For example, in *White v. Tackett,* 173 S.W.3d 149, 151 (Tex.App.-Fort Worth 2005), the plaintiff alleged that a Texas Department of Public Safety trooper was "reckless" in initiating and continuing a high speed pursuit that ultimately led to her injuries. The court agreed that the trooper's conduct presented "a clear risk of harm to the public in continuing, rather than terminating, the pursuit," but held the risk was outweighed by the need to apprehend the suspect. *Id.* at 155. The defense of official immunity exists precisely because government employees are sometimes called upon to take measured risks in the performance of their duties that may sometimes result in injury or damage to others.

Further, Stage based his opinion regarding Green's recklessness on the fact that he had an accident. In other words, Stage testified that because Green collided with a vehicle, his conduct, *ipso facto,* involved a high degree of risk. Stage testified, "If [Green] looked and thought it was clear and there was a vehicle there, then he didn't take the time to look and see clearly." However, I do not agree with Stage's assumption that Green's inaccurate perception necessarily rendered it unreasonable for him to have believed that all traffic was stopped based upon his knowledge at the time. "If this were so, any admission that a risk existed would defeat the element of good faith, and any collision would be adequate evidence that a reasonable employee would have assessed the risk differently, thereby vitiating the doc-

trine of official immunity in most or all cases. Official immunity is designed to encourage emergency personnel to take reasonably calculated risks when they have properly considered need and risk, not to punish them for having done so." *City of San Angelo Fire Dep't v. Hudson,* 179 S.W.3d 695, 706 (Tex.App.-Austin 2005, no pet.). Most importantly, Stage did not testify that no reasonable firefighter under the same or similar circumstances would have entered the intersection as Green did.

The Alfords also relied on the testimony of J.D. Gardner, the Chief of the Pasadena Volunteer Fire Department. Gardner testified that no reasonable firefighter would drive a fire truck without corrective lenses if such lenses were required by the terms of his driver's license. While the testimony was conflicting, the trial court found that Green was not wearing corrective lenses at the time of the collision although they were required by his license. If there had been an issue as to whether Green's failure to wear corrective lenses was a contributing cause of the accident, Gardner's testimony in this regard would have been sufficient to rebut Green's defense of official immunity thereby creating a fact issue for the trier of fact. However, the trial court found Green failed to see the Alfords' vehicle, not because he failed to wear corrective lenses, but because intervening traffic was blocking his view of the far right lane. Thus, Green's failure to wear corrective lenses is immaterial because it was not a contributing cause of the accident.

Gardner was asked several times whether any reasonable firefighter would have entered the intersection at 23 miles per hour when he could not see the third lane of traffic. In response, Gardner repeated-

---

**5.** The purpose of common-law official immunity is to protect public officials from being forced to defend their decisions that were reasonable when made, but upon which hindsight has cast a negative light. *Id.* at 463.

ly testified that he believed in such a scenario the firefighter should proceed with "due regard." Gardner was then asked:

Q. Okay. But I'm talking about all these assumptions. If he was going 23 miles-per-hour, if he couldn't see the last lane of traffic, if he couldn't stop in time; that wouldn't be due regard, would it?

A. Oh, no, sir.

Thereafter Gardner was asked:

Q. All right. We were talking about due regard. I wanted to come back to this. This was your testimony, right, that a reasonable fire truck operator must use due regard, right?

A. Uh-huh.

Q. While operating a fire truck, right? Is that "yes"?

No. 1?

A. Yes, sir.

Q. Is this your testimony that a reasonable fire truck operator must use due regard?

A. Yes, sir.

Q. Now, I want you to consider these assumptions:

Number 2: A fire truck has a red light on Jana, okay?

A. Uh-huh.

Q. Is that okay?

A. I said yes, sir.

Q. Westbound Fairmont Parkway has three lanes at 11 feet wide per lane, okay?

A. Yes, sir.

Q. Westbound Fairmont Parkway is a busy intersection, okay?

A. Yes, sir.

Q. The time of the collision was during Friday rush hour, okay?

A. Okay.

Q. The vision of the northern most lane of westbound Fairmont is obscured and the driver of the fire truck never sees the Alford truck, okay?

A. Yes, sir.

Q. The fire truck is traveling at a speed in which it cannot stop before it enters the northern most or third lane of westbound Fairmont Parkway?

A. Yes, sir.

Q. *Okay. Now, knowing all of these assumptions and taking all of these assumptions, Mr. Green would not have been acting in due regard; isn't that right?*

A. *I disagree with you.*

Q. Okay. Well, which one of these assumptions—I mean, do you—are you disagreeing with the assumptions?

A. *How fast was the Alford truck traveling? I mean, there is a lot of things that you are not putting in here. The fire truck operator fulfilled his requirement by visually checking the lane of traffic and he was operating in that apparatus in due regard because it was his assumption that he had acquired the right-of-way to that intersection when he proceeded through it.*

(Emphasis added).

While Gardner's testimony comes close to creating a fact issue, the test is not whether a "reasonable" firefighter would have slowed to 2 miles per hour, stopped, or even stepped out of the truck to physically inspect all lanes of traffic on foot. In other words, the "test of good faith does not inquire into 'what a reasonable person would have done,' but into 'what a reasonable [person] could have believed.'" *Ballantyne*, 144 S.W.3d at 426 (quoting *Telthorster*, 92 S.W.3d at 465 quoting *Wadewitz v. Montgomery*, 951 S.W.2d 464, 467 n. 1 (Tex.1997)). Here, Gardner did not testify that no reasonable firefighter could have believed the risk taken by Green when he entered the intersection

against a red light was justified under the circumstances.

The Alfords contend Green is bound by the trial court's findings of fact and that such findings created a fact issue regarding Green's good faith. In light of Stage's and Gardner's failure to testify that no reasonable firefighter would have entered the intersection as Green did under the same or similar circumstances, the question is whether a plaintiff can rebut a prima facie showing of good faith so as to create a fact issue without the benefit of expert testimony.

It is well established that if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education *may* testify thereto in the form of an opinion or otherwise." TEX.R. EVID. 702 (emphasis added). Such expert testimony is *required*, however, when the alleged negligence is of such a nature as not to be within the experience of laymen. *FFE Transp. Servs., Inc. v. Fulgham*, 154 S.W.3d 84, 90 (Tex.2004). When asserting the affirmative defense of official immunity, the government employee may meet his burden of showing good faith through his own testimony.[6] Of course, the defendant employee has the requisite experience, training, etc. to testify in his own behalf precisely because he is a fireman, policeman, ambulance driver, etc. Here, the evidence shows that Pasadena Volunteer

firefighters usually have 12 weeks of training and all are certified firefighters. Some portion of that training relates to driving emergency vehicles. One witness, for example, described a course for driver certification that requires a minimum of 16 hours of instruction, as well as, testing and driver qualification exercises.

While driving is certainly in the sphere of experience for the average laymen, few have any experience driving emergency vehicles. Moreover, to *rebut* a defendant's showing of good faith so as to create a fact issue, the plaintiff must first show that "no reasonable person *in the defendant's position* could have thought the facts were such that they justified defendant's acts." *Chambers*, 883 S.W.2d at 657 (emphasis added). Driving an emergency vehicle in contravention of normal traffic laws, where a delayed response could prove fatal to one or more persons, in crowded conditions is simply not an activity within the common experience of laymen. Thus, under the circumstances presented here, the Alfords were required to proffer the testimony of an expert witness. Of course, the Alfords offered the testimony of several experts, but none testified that no reasonable firefighter could have believed he was justified in entering the intersection as Green did after weighing the risk of an accident against the need to respond to the emergency alarm.

Without expert testimony that no reasonable firefighter would have proceeded

---

6. *See Freeman v. Wirecut E.D.M., Inc.*, 159 S.W.3d 721, 730 (Tex.App.-Dallas 2005, no pet.) (holding police officer may establish good faith through his own testimony); *Zuniga v. Navarro & Assocs., P.C.*, 158 S.W.3d 663, 672 (Tex.App.-Corpus Christi 2005, pet. denied) (holding good faith may be established in summary judgment context by the defendant official's own affidavit); *Gidvani v. Aldrich*, 99 S.W.3d 760, 764 (Tex.App.-Houston [1st Dist.] 2003, no pet.) (holding district at-

torney could establish good faith in summary judgment context by his own affidavit); *Hayes v. Patrick*, 45 S.W.3d 110, 116 (Tex.App.-Fort Worth 2000, pet. denied) (holding police officer may establish good faith in context of summary judgment by his own affidavit); *Beatty v. Charles*, 936 S.W.2d 28, 31 (Tex. App.-San Antonio 1996, no writ) (holding good faith may be established by expert testimony or the defendant police officer's testimony).

through the intersection as Green did, the Alfords did not (1) offer any evidence to rebut Green's prima facie defense of official immunity and (2) no fact issue exists on this issue for the trier of fact to resolve. Accordingly, I respectfully dissent.