**Affirmed and Memorandum Opinion filed July 2, 2015.**



In The

# Fourteenth Court of Appeals

## NO. 14-14-00033-CV

## PATRICIA MARTIN, Appellant

## V.

## GREGG BRINKLEY AND SARAH BRINKLEY, Appellees

**On Appeal from the 113th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2009-40136**

## M E M O R A N D U M   O P I N I O N

In this appeal from the judgment rendered after a nonjury trial, a landlord seeks reversal of the trial court's judgment against her on her tenants' claims for failure to repair the premises and for bad-faith retention of their security deposit. She contends that the tenants' failure-to-repair claim is barred by res judicata because it could have been litigated in the landlord's unsuccessful forcible-detainer action. She also challenges the judgment on factual-sufficiency grounds. We conclude that the res judicata argument was not preserved in the trial court, and

that the evidence is factually sufficient to support the trial court's implied findings. We therefore affirm the trial court's judgment.

## I. BACKGROUND

This is the second lawsuit between landlord Patricia Martin and tenants Gregg and Sarah Brinkley arising from the Brinkleys' one-year lease of a home nearly six years ago. The Brinkleys rented the three-bedroom, two-bathroom home from October 2008 to October 2009 for $975 per month, and paid a security deposit of an additional $975. Martin's own home was directly across the street from the rented property.

The problems began with the Brinkleys' requests for repairs. In December 2008, the Brinkleys informed Martin that one of the bathtubs was leaking. Several weeks passed. Although the lease permitted Martin to authorize anyone to enter the property without notice to make repairs or to document the property's condition, Martin's husband gave the Brinkleys written notification on January 26, 2009 that he would be in the house working on the plumbing beginning the next day and for the remainder of the week, if necessary. The attempted repair was unsuccessful, and on or about February 20, 2009, Martin's husband replaced the bathtub, but did not finish installing it. Also in February 2009, Gregg's brother Charles and Charles's wife and two children began staying with the Brinkleys.

At the end of March 2009, Martin found that there was a dog in the Brinkleys' backyard. She wrote the Brinkleys a "Final Notice [of] Violation of Lease" demanding immediate removal of the dog and payment of $25 for its presence. Martin also demanded that anyone not named in the lease vacate the property that weekend, or rent would go up by $350 on April 1st. The Brinkleys paid both amounts, and Martin accepted the payment. According to Gregg Brinkley, his brother's family moved out at the beginning of April.

At around this time, Martin decided not to perform any work on the home when the Brinkleys were not there. On April 7, 2009, she left a note for the Brinkleys, "Re: work on Tub. Knocked on door numerous times and rang door bell. No one came to the door." In an effort to have the repairs performed, the Brinkleys sent Martin a certified letter on April 16, 2009 stating that the leaking bathtub had now been unusable for nearly four months. The Brinkleys cited the provision of the Texas Property Code which permitted them to vacate the premises, recover damages, penalties, attorney's fees, and costs.

Martin reacted immediately. On the day she received the letter, Martin sent the Brinkleys a written notice of eviction and demanded that they pay May's rent in cash by noon on April 20, 2009. Two days later, she wrote the Brinkleys a notice to vacate the premises by April 30, 2009. One week after that, she sent the Brinkleys a notice to vacate by May 31, 2009. And four days after that letter, Martin filed a forcible-detainer action ("the eviction suit") in a Harris County justice court. The Brinkleys asserted a counterclaim for retaliation, which is also a defense to an eviction suit. The justice court rendered judgment denying Martin possession of the house, but awarding no other relief. Neither side appealed.

The following month, Martin wrote to the Brinkleys a half-dozen times with various demands and accusations. Among other things, she purported to raise the rent by $500 per month per adult, asserted that the Brinkleys owed her $200 for damages to fence material that Martin had left in the Brinkleys' backyard, and demanded first $315 then $500 as additional rent for Sarah's sister, who had visited that month. In September 2009, Martin twice notified the Brinkleys in writing that their lease would terminate on October 31, 2009.

The Brinkleys vacated the premises on time, and two days later, Sarah Brinkley wrote to Martin, advising her of the Brinkleys' forwarding address and enclosing the keys to the house. On December 4, 2009, Martin mailed a demand

letter to the Brinkleys, threatening to sue if she were not paid $9,108 within ten days. Martin arrived at the figure by listing the cost to remedy a number of conditions on the leased premises, adding the amount that she considered was due to her as additional rent, and subtracting the Brinkleys' $975 security deposit.

The Brinkleys sued Martin for breach of contract and for violation of various statutes requiring a landlord (a) to make timely repairs, (b) to timely provide an accounting of charges against a security deposit and to return the remainder, and (c) to refrain from filing a retaliatory eviction suit against a tenant who makes a repair request. The case was tried without a jury, and the trial court granted judgment in the Brinkleys' favor for $4,792.00, plus attorney's fees of $12,039.25 and conditional attorney's fees in the event of an unsuccessful appeal. Both sides filed initial requests for findings of fact and conclusions of law, but the trial court issued none, and neither side pursued the issue by filing a notice of past due findings of fact and conclusions of law. Martin moved unsuccessfully for a new trial or for modification of the judgment, and now brings this appeal.

In both her motion for new trial and in her appellate brief, she acknowledged that the trial court did not render judgment on the Brinkleys' retaliation claim, but instead awarded them the amount requested for their claims of failure to repair and bad-faith retention of their security deposit. Moreover, both sides submitted proposed findings of fact and conclusions of law in which they agreed that the retaliation claim was litigated in the earlier eviction suit and that the Brinkleys are precluded from relitigating it. Consequently, the Brinkleys' claims for failure to repair and for bad-faith retention of their security deposit are the only claims before us.

4

## II. ISSUES PRESENTED

Martin presents three issues for review. In her first issue, she asserts that the Brinkleys' failure-to-repair claim was a compulsory counterclaim that they were required to assert in the eviction suit, and that the claim is now jurisdictionally barred by res judicata. She contends in her second issue that the trial court erred in finding that she failed to adequately or timely perform repairs. In her third issue, Martin argues that trial court erred in finding that she wrongfully withheld the Brinkleys' security deposit.

## III. RES JUDICATA

Martin argues that res judicata deprived the trial court of jurisdiction over the Brinkleys' claims for failure to repair. Res judicata, however, is not a jurisdictional matter, but an affirmative defense that must be affirmatively pleaded, *see* TEX. R. CIV. P. 94, or tried by consent. *See In re R.J.P.*, 179 S.W.3d 181, 183 n.1 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (plurality op.). The distinction between an affirmative defense and a jurisdictional deficiency is an important one, because a complaint that the trial court lacked subject-matter jurisdiction can be raised for the first time on appeal, whereas most other complaints must have been preserved in the trial court. *Compare City of Houston v. Rhule*, 417 S.W.3d 440, 442 (Tex. 2013) (per curiam) (explaining that a trial court that acts without subject-matter jurisdiction "commits fundamental error that we may review for the first time on appeal") *with* TEX. R. APP. P. 33.1(a) (providing that a timely request, objection, or motion is "a prerequisite to presenting a complaint for appellate review").

Martin did not raise the defense of res judicata in her pleadings, but the record shows that the Brinkleys did not object at trial when Martin introduced evidence that in the forcible-detainer suit, the Brinkleys had filed a counterclaim

for retaliation. Moreover, before the trial court rendered judgment in this case, both sides filed proposed findings of fact and conclusions of law asking the trial to conclude that the Brinkleys' retaliation claim is barred because it previously was litigated. Thus, the question of whether the Brinkleys' retaliation claim is barred was tried by consent, and the parties agree that the claim is barred.

On appeal, however, Martin argues that a different claim is precluded. She contends that the Brinkleys' statutory claim for failure to repair is barred because it could have been litigated in the forcible-detainer suit.[1] She raised that argument for the first time in her motion for new trial or for modification of the judgment, and requested no findings of fact or conclusions of law on the issue. Thus, Martin's contention that the Brinkleys' failure-to-repair claim is barred by res judicata was neither pleaded nor tried by consent, and has not been preserved for appeal. *See MAN Engines & Components, Inc. v. Shows*, 434 S.W.3d 132, 135–37 (Tex. 2014) (holding that an affirmative defense first raised in a post-verdict motion was not preserved, because affirmative defenses must be pleaded before trial or tried by consent); *Monk v. Westgate Homeowners' Ass'n, Inc.*, No. 14-07-00886-CV, 2009 WL 2998985, at *3 (Tex. App.—Houston [14th Dist.] Aug. 11, 2009, no pet.) (mem. op.) ("An affirmative defense that is not pleaded or proved, and on which findings are not obtained, is waived and cannot be preserved by raising the affirmative defense for the first time in a motion for new trial.").

Because this complaint was not preserved in the trial court, we overrule this issue.

---

[1] Although we do not reach the merits of this issue, Martin is incorrect. *See* TEX. PROP. CODE ANN. § 92.335 (West 2014) (although retaliation is a defense available to the tenant in an eviction suit, "[o]ther judicial actions under this chapter may not be joined with an eviction suit or asserted as a defense or crossclaim in an eviction suit"). The Brinkleys' claims of failure to repair and wrongful retention of a security deposition are "judicial actions under this chapter." *See id.* §§ 92.051–.062 (failure to repair); *id.* §§ 92.101–.109 (wrongful retention of security deposit).

## IV.  EVIDENTIARY SUFFICIENCY

In Martin's second and third issues, she challenges the trial court's implied findings that she failed to adequately and timely repair the premises and that she retained the Brinkleys' security deposit in bad faith.  Martin does not identify the grounds on which she challenges these implied findings.  With the exception of her request that we dismiss the failure-to-repair claim on jurisdictional grounds, the only relief she requests is that we reverse the trial court's judgment and remand "any remaining claims involving the security deposit, damages and attorney's fees and costs."[2]  Because reversal and remand is the result to which she would be entitled if the evidence were factually insufficient to support the judgment, we construe her remaining issues as challenges to the factual sufficiency of the evidence.  *See Magana v. Citibank, N.A.*, 454 S.W.3d 667, 681 n.11 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (examining the appellants' prayer for relief and concluding that they challenged the factual sufficiency of the evidence because they sought remand, which is the appropriate remedy when the evidence is factually insufficient).

When a complete reporter's record is filed, we review the trial court's findings of fact for legal and factual sufficiency under the same standards we apply to jury verdicts.  *Green v. Alford*, 274 S.W.3d 5, 23 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (op. on reh'g en banc) (citing *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996) (per curiam)).  To analyze a factual-sufficiency challenge, we consider all of the evidence in a neutral light, and we will set aside a finding only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust.  *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (per curiam).  The amount of

---

[2] Martin also asks that we remand her counterclaim, but she has not presented or briefed that issue.

7

evidence needed to affirm is far less than the amount required to reverse a judgment. *Farmers Tex. Cnty. Mut. Ins. Co. v. Pagan*, 453 S.W.3d 454, 466 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (citing *GTE Mobilnet of S. Tex. v. Pascouet*, 61 S.W.3d 599, 616 (Tex. App.—Houston [14th Dist.] 2001, pet. denied)). The factfinder "is the exclusive judge of the facts proved, the credibility of the witnesses and the weight to be given to their testimony." *Benoit v. Wilson*, 150 Tex. 273, 281, 239 S.W.2d 792, 796 (1951). Because this court is not a factfinder, we may not pass upon the witnesses' credibility or substitute our own judgment for that of the factfinder, even if the evidence would clearly support a different result. *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998) (citing *Pool v. Ford Motor Co*., 715 S.W.2d 629, 634 (Tex. 1986) (op. on reh'g)).

## A.      Landlord's Failure to Repair

A landlord is liable to a tenant if, within a reasonable time after receiving the tenant's written notice to do so, the landlord fails to make a diligent effort to repair or remedy a condition that materially affects the physical health or safety of an ordinary tenant. *See* TEX. PROP. CODE ANN. § 92.056(b) (West 2014). There is a rebuttable presumption that seven days is a reasonable time. *Id.* § 92.056(d). Among other judicial remedies available for such failure to repair, the tenant may obtain judgment against the landlord for a civil penalty equal to one month's rent plus $500, together with court costs and attorney's fees. *Id.* §§ 92.056(e)(4), 92.0563(a)(3), (5).

Although the Brinkleys complained of several instances of Martin's failure to make repairs, a single example is sufficient to support the trial court's implied finding that Martin violated the statute. Martin testified that she had known since December 2008 that the front bathtub in the house leaked. By January, water was puddling on the tile floor outside the bathroom. Martin began repairs on or about January 26, 2009, but the repairs were not completed. On April 16, 2009, the

8

Brinkleys sent Martin a certified letter stating that it had been nearly four months since their initial complaint, and the condition still had not been repaired. Although Martin admitted at trial that this "create[d] a health and safety risk," she testified that she had decided even before receiving the letter that she and her husband "were not going to go back into the house." Martin acknowledged that the repairs were not completed even by the end of the Brinkleys' tenancy on October 31, 2009.

Martin argues that she was not obliged to repair the property because (1) she had overheard a verbal threat by an unknown person, (2) "there were numerous parties who recognized that guns were an issue at the leasehold," and (3) "[a]nonymous people resided at the household for weeks on end."

Regarding the alleged verbal threat, Martin testified that around the same time that she received the Brinkleys' certified letter in April 2009, she and her husband were working on the fence, "and these two guys – we could hear them talking loudly and saying – they called us 'that white man' and whatever, that they were going to kill him if he goes back into the house." Martin admitted that the speaker was not one of the Brinkleys, and she has "no idea who these men were." She testified that she told Gregg Brinkley about it, and he said, "don't worry about it." Gregg, however, gave a different version of that conversation. He testified that Martin told him "that there was people in the house being very disrespectful and cussing at her, and I told her there was no one in the house. She said, 'Yes, there is. I can hear them from outside.'" Gregg responded, "If there's anybody in the house, call the police. Go inside. Find out if somebody is in there because if somebody is in my house, they shouldn't be there." He stated that by June or July 2009, Martin's husband had "claimed that he was scared" and had stopped coming to the house, but the Martins never explained why. According to Gregg, the Martins "said they didn't like the music. . . . We listen to a lot of hip-hop rap stuff.

9

They cuss, they say all kinds of stuff; but it's music." Reviewing the conflicting evidence under the applicable standard of review, we must presume that the trial court did not find Martin's version of events to be credible.

Martin's argument regarding guns consists of a single sentence that is not supported by the record. She states in her brief, "The testimony of Ms. Brinkley establishes that there were numerous parties who recognized that guns were an issue at the leasehold." There is no such testimony in the record.

Finally, Martin's assertion about "anonymous people" living in the house "in violation of the lease" is not supported by the record. The Brinkleys and their two children lived at the house, and from February 2009 to the beginning of April 2009, Gregg's brother Charles resided with them, accompanied by his own wife and two children. The extended family were not "anonymous"; Martin admitted that she learned that Charles and his family were staying at the house on or about February 20, 2009, and that when Martin's husband replaced a bathtub in the house that month, Charles helped him move the old bathtub. Moreover, Martin responded to the presence of the extended family with a modification to the lease. On March 29, 2009, Martin wrote to the Brinkleys, "All people not on the lease will leave this weekend or rent goes up by $350.00 per month on April 1st." It is undisputed that the Brinkleys paid Martin the additional $350, and that Martin accepted it. Gregg testified that his brother's family moved out "at the very beginning of April." We presume that the trial court credited this evidence.

After reviewing the entire record in a neutral light, we conclude that the evidence is factually sufficient to support the trial court' implied finding that Martin violated section 92.056 of the Texas Property Code by failing to make diligent efforts to repair a condition that materially affected the physical health or safety of an ordinary tenant. We overrule this issue.

**B.     Landlord's Bad-Faith Retention of Security Deposit**

A landlord who retains a security deposit in bad faith is liable to the tenant in the amount of $100 plus three times the amount of the security deposit that was wrongfully withheld, together with the tenant's reasonable attorney's fees to recover the deposit. *Id*. § 92.109(a). When a tenant sues a landlord for bad-faith retention of the tenant's security deposit, the landlord bears the burden to prove that retaining any portion of the security deposit was reasonable. *Id*. § 92.109(c). A landlord is presumed to act in bad faith if the landlord fails either to refund the tenant's security deposit or to provide a written description and itemization of deductions from the security deposit by the thirtieth day after the tenant surrenders possession. *Id.* § 92.109(d).

Here, Martin did not return the security deposit or provide an itemized accounting within thirty days after the Brinkleys surrendered the premises. Although this gives rise to a presumption that Martin acted in bad faith, the implied finding of bad faith is independently supported by abundant evidence. Before analyzing Martin's arguments further, we will mention just a couple of illustrative examples.[3]

In her accounting of the charges applied against the Brinkleys' security deposit, Martin charged the Brinkleys an additional month's rent for the stated

---

[3] When an appellate court determines that the evidence is factually sufficient to support the trial court's judgment, the reviewing court is not required to detail the evidence that supports that conclusion. *Ellis Cnty. State Bank v. Keever*, 888 S.W.2d 790, 794 (Tex. 1994) (sub. op.) (explaining that the detailed review required when the reviewing court reverses on factual-insufficiency grounds is not required when the reviewing court affirms). The single exception is that when a party makes a factual-sufficiency challenge to the amount of exemplary damages awarded, the appellate court must detail the relevant evidence and explain why it does or does not support the amount awarded. *See In re A.B.*, 437 S.W.3d 498, 503–04 (Tex. 2014) (explaining why a challenge to the amount of exemplary damages awarded is the sole exception to this rule, and declining to make a second exception for factual-sufficiency challenges to the termination of parental rights).

reason that "[t]he house was not made accessible to show to possible renters the last month of the lease."  Under the lease, however, the Brinkleys could not have prevented Martin from showing the property.  The lease provides, "Before accessing the Property, Landlord . . . will attempt to first contact Tenant, but may enter the Property at reasonable times without notice to make repairs or to show the Property to prospective tenants . . . ."  Moreover, Martin admitted at trial that she never discussed showing the property with the Brinkleys, but simply decided, "I was going to wait until they left."  There was no basis whatsoever for Martin to charge the Brinkleys for her own unilateral decision to delay showing the house.

Martin also stated that she was charging the Brinkleys $6,000 because they "[c]ontinued to allow adults not on the lease [to] live in the house for the months of December (2 adults), January (2 adults), February (2 adults), March (2 adults), May (2 adults), June (2 adults) and July 1 adults [sic].  $500/adult.  Total = $6000."[4]  The Brinkleys testified that although members of their families visited, the only time that others lived with them at the house was the brief period when the Charles Brinkley family resided with them.  The record establishes that Martin already had demanded additional rent for their presence, and she admits that the Brinkleys paid her.  As for Martin's belief that people resided with the Brinkleys at any other time, Martin admitted that she did not see anyone else sleep there and that it was possible that the people she saw were not sleeping there.

As for the remaining charges, Martin admits on appeal that "[t]here was a substantial amount of dispute during the trial as to the extent of repairs needed."  Our review of the record reveals that there was conflicting testimony about the need for nearly all of the repairs or cleaning for which Martin charged the

---

[4] This would total $6,500.

12

Brinkleys.[5] In accordance with the standard of review, we must presume that the trial court found the evidence favoring the Brinkleys to be credible.

Martin nevertheless asserts that "[p]hotos taken by Defendant establish . . . a substantial amount of damage that existed at the hands of the tenants at the end of the lease period." The evidence at trial included only two photographs by Martin that purported to show the condition in which the Brinkleys left the property. Martin agreed that the photographs "showed two areas of tile that could have been cleaned better, in [Martin's] opinion." Martin contends "that these photographs and related repair testimony establish a pattern/cost of repairs that warranted the withholding of the entire deposit and submission of an additional charge of approximately $1,000.00 to the [Brinkleys]." But, the amount that Martin in fact charged the Brinkleys is more than nine times larger than the amount that she now says is warranted.

We also do not agree that the photographs and related testimony establish that Martin was justified in withholding the Brinkleys' security deposit. One of the photographs shows a streak of dirt across two floor tiles. Of this photograph, Martin testified, "I have no clue where this is." The remaining photograph shows an even smaller area, and according to Martin, the area shown was located in the kitchen behind the refrigerator. When questioned further about her claim that the kitchen required extensive cleaning, Martin testified that she did not spend a lot of time cleaning the refrigerator, but that she spent a lot of time cleaning the stove. She retracted the latter statement, however, after she was impeached with her deposition testimony. When asked in her deposition to describe "the detailed cleaning in the kitchen" for which she charged the Brinkleys, Martin testified,

---

[5] There were two exceptions. The Brinkleys agreed with Martin's charge of $16 to replace light bulbs and $20 to replace window blinds. These amounts were not included in the judgment.

13

"The stove was left—it was left filthy.  I can tell you it was horrible."  Opposing counsel then asked, "Isn't it true that the Brinkleys brought their own stove and took their own stove with them when they left?"  Martin responded, "I thought I had a stove in there first.  No.  Well, then, I guess not.  Did I have a refrigerator then?  I can't remember.  Well, it was dirty.  I have pictures of it.  It was filthy." At trial, however, she further admitted that the two photographs of tile were the only photographs she produced in this lawsuit, and that she could not remember whether the Brinkleys brought their own stove and refrigerator.

After reviewing the entire record, we cannot agree that the trial court went against the great weight and preponderance of the evidence in impliedly finding that Martin withheld the Brinkleys' security deposit in bad faith.  We accordingly overrule this issue.

## V. CONCLUSION

Because the evidence is factually sufficient to support the trial court's implied findings, and no other issues have been preserved for our review, we affirm the trial court's judgment.


/s/     Tracy Christopher
          Justice



Panel consists of Justices Christopher, Brown, and Wise.

14